No. 05-455C
(JUDGE SWEENEY)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CORT ANCMAN AND EILEEN ANCMAN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant

---

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

Margaret K. Krasik, Esq.
Attorney for Plaintiffs

600 Forbes Avenue
Pittsburgh, Pa. 15282
Telephone: 412-396-6302
Fax: 412-396-4014
Email: krasik@duq.edu

February 5, 2007

# TABLE OF CONTENTS


Table of Authorities ……………………………………………………………………ii

Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss,
And Plaintiffs' Cross-Motion For Judgment on the Administrative Record ………………………………………………………… ……1

Statement of Questions Involved ……………………………………… …… …2

Statement of Facts ……………………………………………………………………3

Summary of the Argument ……………………………………………………..…8

Argument …………………………………………………………………………… 9

1. Statutes, regulations, policies and practices that govern Air Force retirement pay constitute a money-mandating source of law for Tucker Act purposes because they are sources of law that can fairly be Interpreted as mandating monetary compensation by the government for Harm sustained by the Plaintiffs here. ……………………………………….……9

2. Plaintiffs are entitled to judgment on the administrative record. The Assistant Secretary's decision to reject the AFBCMR's recommendation and deny Plaintiffs' petition was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence in the administrative record. Substantial evidence in the administrative record supports the Board's recommendation that the Plaintiffs be awarded compensation to cure an injustice. ……. ……………………..……………………31

Conclusion …………………………………………………………………………. 36

| Appendix | Appendix Page |
|---|---|
| DoD Financial Management Regulation | |
| Vol. 12, Chap. 18 | 1 |
| Vol. 7b Foreward | 4 |
| Vol. 7b Chap. 10 | 6 |
| Air Force Instruction 36-2604 | 9 |
| Air Force Instruction 3603203, Attachment 8 | 42 |

Appendix, cont'd.


| | |
|---|---|
| AFBCMR 00-01988 (Case 4) | 44 |
| AFBCMR 00-00105 (Case2) | 50 |
| AFBCMR 00-02254 | 56 |
| AFBCMR 02-01500 | 60 |
| Department of Defense Instruction 1336.6 (1994) | 66 |

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Covington v. Department of Health and Human Services,
750 F.2d. 937 (Fed.Cir.1984)………………………………..………….....… 27

Duhon v. United States,
198 Ct. Cl. 568, 461 F.2d 1278 (1972) ……………………………….……… 20, 22

Eastport Steamship Corp. v. United States,
178 Ct.Cl. 599, 372 F.2d 1002 (1967)……………………………….……….....9, 20

Fisher v. United States,
402 F.3d 1167(Fed. Cir. 2005) ………………………...……………… 10, 22, 23, 30

Gollehon Farming v. United States,
207 F.3d 1373 (Fed. Cir. 2000) ………………………………..……………… 10

Hoffman v. United States,
894 F.2d 380 (Fed. Cir. 1990) …………………………………………..……… 34

Longhofer v. United States,
29 Fed.Cl. 595 (1993) ………………………………..………………………… 25, 26

Lynn v. United States,
58 Fed.Cl. 797 (2003) …………………………………………………………..… 26

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) ……………………………………………..… 23, 24

OPM v. Richmond,
496 U. S. 414 (1990) ……………………………………………………………… 35

Sammt v. United States,
780 F.2d 31 (Fed. Cir.1985) ………………………………………………….….. 26

Sanders v. United States,
219 Ct. Cl. 285, 594 F.2d 804 (1979) ……………………………………… 22, 31

Scharf v. Department of the Air Force,
710 F.2d 1572 (Fed. Cir. 1983) ……………………………………….….…… 26

Skaradowski v. United States,
200 Ct. Cl. 488, 471 F.2d 627 (1973) ........................................... 20

Strickland v. United States,
423 F.3d 1335 (Fed. Cir. 2005) ........................................... 31

Tippett v. United States,
185 F.3d 1250 (Fed. Cir. 1999)........................................... 25

United States v. Mitchell,
463 U.S. 206 (1983) ........................................... 9

United States v. Testan,
424 U.S. 392 (1976) ........................................... 9

United States v. White Mountain Apache Tribe,
537 U.S. 465 (2003) ........................................... 10

Yee v. United States,
512 F.2d 1383........................................... 19

**STATUTES**

10 U.S.C. 1401-1414........................................... 12

10 U.S.C. § 1405........................................... 12, 28, 33, 34

10 U.S.C. § 1552........................................... 21, 22, 23, 25, 35

10 U.S.C. § 8911 ........................................... 12

28 U.S.C. § 1491........................................... 9

31 U.S.C. § 1341(a)(l )(B) ........................................... 35

National Defense Authorization Act for Fiscal Year 1993,
Pub. L. No. 102-484, § 4403, 106 Stat. 2315, 2702-2704 (1992)
(TEMPORARY EARLY RETIREMENT AUTHORITY) ...........................................12

**ADMINISTRATIVE REGULATIONS**

Department of Defense Financial Management Regulation 7000-14R

FMR, Vol. 12, Chap. 18, 1801………………………….....…………………… 13

FMR, vol. 7B, Forward……………………………………….…………….……..14

FMR, vol. 7B, Chap. 10…………………………………………………………… 14

Department of Defense Instruction 1336.6,
Correction of Military Records……………………………………….…………… 25

Air Force Instruction 36-2604,
Personnel: Service Dates and Dates of Ranks…….………………………..…… 15

Air Force Instruction 36-3203,
Service Retirements……………………………..………………… 15, 16, 25, 32

**SECONDARY AUTHORITIES**

Alfred C. Aman, Administrative Law, (2d ed. West Pub., 2001) ……………………..… 16

G.C. Sisk, The Tapestry Unravels; Statutory Waivers of Sovereign
Immunity and Money Claims Against the United States,
71 Geo. Wash. L. Rev. 602 (2003) ……………………………..……………… 10

Jeffrey Glosser & Keith Rosenberg, Military Correction Boards:
Administration Process and Review by the United States
Court of Claims, 23 Am. U. L. Rev. 391 (1973) ………………………..… 17, 19, 20

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CORT ANCMAN and EILEEN ANCMAN,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 05-455C** |
| | ) | **(Judge Sweeney)** |
| | ) | |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant** | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND PLAINTIFFS' CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiffs respectfully request denial of Defendant's motions to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6). Further, Plaintiffs, pursuant RCFC 56.1, respectfully request that the Court issue judgment on the administrative in their favor because the Assistant Secretary here acted arbitrarily, in abuse of discretion, and without substantial evidence in the record to support her denial of the Plaintiffs request for correction of military records.

In support of these requests, the Plaintiffs rely on their Complaint, the administrative records in their cases, Plaintiffs' response and additions to the Defendant's statement of facts, said response filed contemporaneously with this motion, and the following brief and appendix.

**STATEMENT OF QUESTIONS INVOLVED**

I. Do statutes, regulations, policies and practices that guide the Air Force's administration of the retirement pay system constitute a money-mandating source of law for Tucker Act purposes because they can fairly be interpreted to mandate monetary compensation by the government for harm sustained by the Plaintiffs?

II. Was the Assistant Secretary's decision to reject the AFBCMR's recommendation to increase the Plaintiffs' retirement pay arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence?

## STATEMENT OF THE FACTS

Eileen G. Ancman and Cort B. Ancman were active duty Majors in the United States Air Force until their retirement on August 31, 1998. Cplt. ¶¶ 3,6,8.

Mr. and Mrs. Ancman applied for early retirement under The Fiscal Year 1998 Drawdown Program for Temporary Early Retirement Authority ("TERA") which was offered for a limited time by the Air Force on a first come, first served basis. AR1 at 39, 67; AR2 36, 64. Despite arriving at Pentagon Military Personnel Flight ("MPF") at 4:30 AM on December 2, 1997, the first day the program was offered, the Ancmans were not first in line to apply under TERA. AR1 at 39; AR2 36.

On the same day, before submitting TERA applications, the Ancmans were given by MPF personnel written estimates of retired pay (before taxes) of $1,535 for Eileen Ancman, and $1,483 for Cort Ancman. Cplt. ¶ 7; AR1 at 16, 39; AR2 at 15, 36. These estimates were generated with a computerized program by personnel at the MPF. Cplt. ¶ 7; AR1 at 25; AR2 at 22. At this same time the Ancmans were counseled by--and allowed to ask questions of--the MPF personnel. Cplt. ¶ 7; AR1 at 12; AR2 at 11. As a condition of submitting their TERA application they were then required to review and sign a Retirement Pre-Application Checklist ("pre-retirement checklist") in which they acknowledged that they had received a pay estimate, understood how their retired pay was computed, received counseling, and were given the opportunity to ask additional

questions. AR1 at 29-30 ¶¶ 6,10; AR2 at 26-27 ¶¶ 6.10. Before signing this checklist they were counseled by the MPF personnel that the computer-generated estimates were accurate within $1 - $2 dollars, a range of accuracy later confirmed by SMSgt. Essa. ¶ 7; AR1 at 23. They were also told that the acceptance of early retirement was "irrevocable" after the one week that TERA applications were accepted. AR1 at 71; AR2 at 70.

Subsequent to receiving the pay estimate from the MPF personnel, the Ancmans contacted DFAS-CL by phone numerous times to update their estimates. They received only a recording that we "…are unable to handle your call in a timely manner now. Please try your call another time". AR1 at 39; AR2 at 36. The Ancmans later discovered from personnel at Nellis and from staff at the office of Senator Bryan that it was known to be very difficult to contact DFAS-CL. AR1 at 39; AR2 at 36.

In reality the 10 U.S.C. 1405 date, crucial to determining the Ancman's eventual retirement pay, had not been calculated at the time they received the estimate. AR1 at 26; AR2 at 23. Cort Ancman needed that 1405 date to have his retirement orders issued which in turn were necessary to set up his household move. This 1405 was not computed until after "many additional months" and "phone calls", which was long after the Ancmans window of revocability had closed. AR1 at 68, 71; AR2 at 65, 70.

Ultimately, Mr. and Mrs. Ancman's retirement applications were approved, and on August 3l, 1998, they were retired. Cplt. ¶ 8. At the time of her retirement, Eileen Ancman had served 15 years, 3 months, and 13 days of active service. AR1 at 4. At the time of his retirement, Cort Ancman had served 15 years, 2 months, and 11 days of active service. AR2 at 4.

On September 25, 1998, the Defense Finance and Accounting Service-Cleveland Center ("DFAS") released a Summary of Retired Pay Account to Mr. and Mrs. Ancman that showed its calculations of the retired pay (before taxes and deductions) that the Ancmans would receive. Eileen Ancman was to receive $1,413 in gross retired pay, and Cort Ancman was to receive $1,393 in gross retired pay, a difference of $122 and $90 respectively. Cplt. ¶ 9; AR1 at l8-l9, 25; AR2 at l7-l8, 22.

On October 7, 1998, Mr. and Mrs. Ancman sought correction of their military records through the AFBCMR, requesting that their retirement pay be increased to reflect the amounts set forth in the estimates they received in December 1997. Cplt. ¶ 11; AR1 at 11; AR2 at 10.

On June 17, 1999, the AFBCMR recommended that Mr. and Mrs. Ancman be granted partial relief by granting 75 percent of the difference in retired pay. AR1 at 7; AR2 at 7. To accomplish the proposed action, the AFBCMR recommended that the plaintiffs' military records be changed to add constructive service to reflect a new total active federal military service date that would then

entitle the plaintiffs to 75 percent of the difference in retired pay. AR1 at 7; AR2 at 7. The Board recommended this equitable relief because it found sufficient relevant evidence to demonstrate the existence of a probable error or injustice. The Board found that MPF used the wrong date of the Ancman's 1405 date and the led them to believe that there would be only a small difference between its estimate and their actual retired pay. AR1 at 7; AR2 at 6.

The AFBCMR's record of proceedings, including the board's recommendation, were forwarded to the Assistant Secretary of the Air Force (Manpower, Reserve Affairs, Installations and Environment) for review and final action. AR1 at 2, 9-10; AR2 at 2, 8-9.

On November 30, 1999, the Assistant Secretary denied Mr. and Mrs. Ancman's application for relief based on her opinion that the Ancmans signed a waiver about the estimates, and that they had the time to contact DFAS-CL for an "official estimate" and didn't. In addition she based her opinion on a lack of "corroborating evidence" that they were mis-counseled by MPF or attempted to receive an official estimate form DFAS-CL subsequent to the MPF estimate. At no time did the Assistant Secretary claim that she or the AFBCMR, did not have the authority to grant the relief awarded by the board. ARI at 9-10; AR2 at 8-9.

On December 20, 1999, Mr. and Mrs. Ancman were notified that the Assistant Secretary had denied their applications because the evidence the Ancmans presented did not demonstrate the existence of probable material error

or injustice. Cplt. ¶ 13; ARI at 2; AR2 at 2. On April 27, 2005, Mr. and Mrs. Ancman filed suit in this Court challenging the Assistant Secretary's decision to deny their applications for relief before the AFBCMR.

## SUMMARY OF THE ARGUMENT FOR THE PLAINTIFFS

This Court has jurisdiction over Plaintiffs' claims for increased retirement pay because Acts of Congress and Department of Defense and Air Force regulations, policies, and practices can fairly be read to mandate the monetary relief that they seek. Congressional statutes covering military retirement pay and the specialized early retirement initiative at issue here, and applicable mandatory Department of Defense and Air Force regulations, policies, procedures and practices together constitute a money-mandating source of law that supports this Court's subject matter jurisdiction under the Tucker Act. Further, and in the alternative, the statute establishing the Air Force Board for Correction of Military Records itself, along with the express procedures and practices of the Board and the Secretary, constitute a money-mandating source of law for Tucker Act purposes. The Plaintiffs' retirement cannot be presumed to be voluntary, and therefore this Court is not deprived of subject matter jurisdiction under the Tucker Act. Finally, the Under Secretary here, acting on behalf of the Secretary in reviewing an reversing the corrections board decision, abused her discretion, acted arbitrarily and capriciously, and rendered a decision that was unsupported by substantial evidence. In addition, an award of money damages to the Plaintiffs would not violate the Appropriations Clause of the United States Constitution. Accordingly, the Court should grant judgment on the administrative record in favor of Plaintiffs.

## ARGUMENT FOR THE PLAINTIFFS

### I. Statutes, regulations, policies and practices that govern Air Force retirement pay constitute a money-mandating source of law for Tucker Act purposes because they are sources of law that can fairly be interpreted as mandating monetary compensation by the government for harm sustained by the Plaintiffs here.

As has been well established, the Tucker Act, 28 U.S.C. § 1491, does not create enforceable substantive rights, but merely provides a limited waiver of sovereign immunity while granting this Court subject matter jurisdiction over cases that are defined to come within its ambit. United States v. Testan, 424 U.S. 392, 398 (1976); United States v. Mitchell, 463 U.S. 206, 216 (1983). Those who seek to have their claims heard in this Court must find a substantive right to money damages from some other source of law, defined by the Tucker Act as "the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491. The substantive law upon which a claimant depends may grant the right to money damages either "expressly or by implication". Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1007 (1967), *as cited in* Mitchell, 463 U.S. at 217 n. 16.

"The central question for Tucker Act purposes . . . is to determine whether a particular . . . provision establishes an entitlement to a money remedy to a **claimant**, as opposed to stating a governmental duty to the **public**. . . . In sum, a claim is cognizable under the Tucker Act if it is founded upon a . . . provision . . . that contemplates compensation in money for violation of the government's duty" to such an individual. G.C. Sisk, The Tapestry Unravels; Statutory Waivers of Sovereign Immunity and Money Claims Against the United States, 71 Geo. Wash. L.Rev. 602, 613 and n. 95, *citing cases* (2003) (emphasis added ). No explicit provision granting a right of action is necessary; neither is the stringent test for finding implied private rights of action applicable. Id. at 626 n. 191, *citing* United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003).

The White Mountain Court recently restated the "money-mandating" definition as follows:

> The "fair interpretation" rule [of Mitchell, 463 U.S. 206 (1983)] demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. . . . It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," . . . a fair inference will do.

White Mountain, 537 U.S. at 472-73 , cited in Fisher v. United States, 402 F.3d 1167, 1173-1174 (Fed. Cir. 2005). In Fisher, the Federal Circuit also addressed the question of how the Court of Federal Claims must address the "money-mandating" issue, given that in the typical case the issue of the Court's Tucker Act jurisdiction is not easily separated from the "merits" question. Sitting *en banc* with regard to its consideration of that issue, the Court overruled Gollehon Farming v. United States, 207 F.3d 1373 (Fed. Cir. 2000), which had prescribed

a two-step approach to determining whether a statute was money- mandating. The Gollehon first step required the plaintiff merely to make a non-frivolous allegation that a source of law could be interpreted as money-mandating. Given a sufficient allegation, the Court could take jurisdiction and then in a second step decide whether the legal provision was in fact money-mandating. A negative finding meant the Court would dismiss the complaint for failure to state a claim upon which relief could be granted. Id. at 1379. The Fisher *en banc* panel replaced the two-step test with a one-step process, whereby "the determination that the source is money-mandating shall be determinative both as to the question of the Court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action. If the Court's conclusion is that the source as alleged and pleaded is not money-mandating, the Court . . . shall dismiss the cause for lack of jurisdiction." Fisher, 402 F.3d at 1173. If the Court has taken jurisdiction, however, upon a finding that a source of law mandates compensation, the Court must decide whether the plaintiff's case fits within the scope of the source. That is, the Court decides either that the plaintiff wins on the merits or that the plaintiff loses on the merits for failing to state a claim on which relief can be granted. Id. at 1175-76.

Plaintiffs here, previously acting *pro se*, have sufficiently alleged and pleaded a comprehensive statutory and regulatory military retirement pay scheme that mandates the particular compensation that they seek. See, e.g., Cplt. ¶¶ 19 & 20. Thus the Court has subject matter jurisdiction. Further, they

have sufficiently established all elements of the cause of action. Neither the defendant's RCFC 12(b)(1) nor defendant's RCFC 12(b)(6) motion should be granted.

**A. The complex statutory and regulatory scheme that governs military retired pay is money-mandating in this case because it can be reasonably interpreted to mandate payment of money to Plaintiffs as compensation for the injustice committed by the military retirement authorities.**

Retirement pay based on length of service for Air Force officers in Plaintiffs' position is statutorily mandated and controlled by 10 U.S.C. § 8911. Section 8926 of the same title provides that years of active service will be the basis of the computation of retirement pay of those retiring under Section 8911. A 1992 Act of Congress established the Temporary Early Retirement Authority, Public law 102-484, § 4403, 106 Stat 2315, 2704-2704 (1992), which provided that the provisions of 10 U.S.C. § 8911 could be applied to Air Force officers with less than 20 but at least 15 years service. Sec. 4403(b)(3). The legislation also provided that "the Secretary of each military department may prescribe regulations and policies regarding the criteria for eligibility for early retirement by reason of eligibility pursuant to this section and for the approval of applications fro such retirement. Such criteria may include factors such as grade, years of

service and skill." Section 4403(d). In addition, chapter 7 of Title 10, comprising 10 U.S.C. 1401-1414, sets out in detail the basis and method for computing a retired members retirement pay, including the "Section 1405 date" that is based on a member's active service. It is clear that these statutory provisions are money-mandating in that they mandate compensation (retired pay) for retired Air Force officers who fall under them.

The money-mandating sources of law on which the Plaintiffs rely here, however, extend beyond the statutory provisions and include the express and mandatory regulations and directives[1] through which the Air Force administered the early retirement program. Department of Defense Financial Management Regulation 7000-4R [**FMR**], Plaintiffs' Appendix pp. 1-3, addresses the TERA Program. The FMR establishes procedures for "funding, accounting for, disbursing, and reporting retirement payments" under TERA, FMR, Vol. 12, Chap. 18, 1801. Section 180304 particularly speaks to the responsibilities of the Defense Finance and Accounting Service (DFAS) to the system and retirees. Under 180304, DFAS was required to "[e]stablish appropriate controls within the accounting system to perform normal accounting and reporting functions for the TERA Program, to "[m]odify military pay systems to compute pay, benefits and withholdings for TERA Program participants, . . [e]stablish methods to distinguish

[1] Plaintiffs have attempted to obtain texts of various regulatory documents in the versions that were applicable when they filed their retirement applications. In most cases, those versions are not available and the Plaintiffs are compelled to rely on the text of the currently available documents. In all cases Plaintiffs have avoided relying on specific language that as determinative of Plaintiffs' rights here, and cite the language of the administrative directive to illustrate the complex and mandatory nature of the regime.

personnel participating in the TERA Program from regular active military members" and to "establish procedures to assist early retirees with actions affecting their pay accounts." FMR, vol.12, chap. 18, 180304. TERA retirees, like the Plaintiffs, clearly were intended beneficiaries of the responsibilities imposed on the Air Force by the FMR.

Volume 7B of the FMR, "Military Pay Policy and Procedures – Retired Pay" , "specifically details entitlements for retired personnel" and "is mandatory for use by all DOD components." FMR, vol. 7B, Foreword. Plaintiffs' Appendix pp. 4-5. Creditable service, gross pay computation, basic pay rates and a multitude of other details are covered in vol. 7B. Of particular importance to the Plaintiffs' claim is Chapter 10, "Correction of Records". FMR, vol. 7B, Chap. 10. Plaintiffs' appendix pp. 6-8. This chapter deals specifically with corrections of military records in the retirement pay context, and affirms that the Secretary, acting through a corrections board, may correct any military record where it is "necessary to **correct an error or remove an injustice**." FMR, vol. 7B, Chap. 10, Section 100101 (emphasis added). This language tracks the language of 10 U.S.C. § 1552, the Corrections Board statute. Section 100103 provides that "[I]f there is a proper correction and a right to the payment of money as result of that proper correction, there must be a change of facts as set out in the original record, or an addition or deletion of a fact. . . . The statute of limitations on a proper correction begins to run from the date of the correction." Finally, payments are not authorized for any claim compensated by private law, Section 100205, and "payments that become due and payable as a result of the correction are

charged to the applicable current retired pay appropriation . . . ." FMR, vol. 7B, chap. 10, Section 1004. The records correction procedure, then, is incorporated into the mandatory procedures that attach to the retirement process.

Myriad other service regulations and administrative materials (e.g., Air Force instructions) form part of the regulatory context. Plaintiffs do not purport to make an exhaustive catalog of all of them, but point out specific examples that exhibit the comprehensive detail and mandatory nature of these directives. Air Force Instruction 36-2604, Personnel: Service Dates and Dates of Ranks [AFI 36-2604], Plaintiffs' Appendix, pp. 9-41, including details on who will compute service dates and what service may be credited when computing the various dates, including the pay date and the 1405 service date. AFI 36-3203: Service Retirements[2], is a detailed instruction that controls the responsibilities of various Air Force entities and personnel in the retirement counseling process and specifically addresses a wide range of procedures, including retirement application procedures and use of the pre-retirement checklist that is in issue in this case. This directive mandates details of the counseling process that attend the handling of applications for early retirement, like the applications submitted by Plaintiffs. This directive specified the use of the retirement checklist (AFI 36-3203, Attachment 7) that was signed by Plaintiffs. AR1 at 28; AR2 at 25.

Defendant relies on the fact that Plaintiffs signed the pre-application checklist that acknowledged receipt of retired pay estimates, see., e.g., Def.

---

[2] AFI 36-3203 is over 100 pages long. It is available digitally at www.e-publishing.af.mil . Plaintiffs have not reproduced the document in its entirety in the Plaintiffs' Appendix, but will supply the Court with a hard copy or will electronically file a PDF format copy if the Court so desires.

Motion, at 22-23, but directives such as AFI 36-3203 also impose duties on the Air Force. For instance, AFI 36-3203 (2003 version) Attachment 8, "Retired Pay Examples and Explanatory Remarks", Plaintiffs' Appendix pp. 42-43 provided, "**Using proper service dates** and personnel data, a prospective voluntary retiree should be able to estimate retired pay based on several options…." Section A8.1 (emphasis added) "Figure the years of service for officers according to 10 U.S.C. 1405 . .. ." Section A8.3 . Plaintiffs propose that the Defendant is required to take the bitter with the sweet. If Defendant argues that the terms mandated by Air Force directives bind Plaintiffs, then such terms must also bind the Defendant. Statutes, regulations and mandatory directives like AFI 36-3203 imposed an obligation on the Air Force to take the required steps to provide a legitimate retired pay estimate using the proper service dates.

In the course of administering the complex regulatory framework governing retirement eligibility, counseling, and pay calculation the Air Force, like other administrative agencies, possesses inherent ability to exercise its discretion to grant a waiver or an "exception to policy". See Alfred C. Aman, Administrative Law. 2d ed. St. Paul, Minn., 2001, 262-263. The Defendant has argued that neither the Board nor the Secretary had authority to grant the Plaintiffs credit for what the Defendant says is not actual service. (The retirement pay statute, 10 U.S.C. § 8911 et seq., however, nowhere refers to "*actual*" service, but instead specifies that retirement pay is calculated with regard to "*active*" service.) In any event, it seems clear that the practice of granting "exceptions to policy" equivalent to waivers of eligibility criteria is part and parcel of the military's

administration of the retired pay system. The Corrections Board statutes, regulations and practice contemplate that the Board (and the Secretary) have such in inherent authority. Plaintiffs argue that when the Corrections Board found that injustice existed and corrected their service dates in an effort to cure it, the Board, like most administrative agencies, was simply exercising its discretionary powers.

In support of this argument, Plaintiffs ask the Court to take judicial notice of certain "Records of Proceedings" of the Air Force Board for Correction of Military Records wherein the Board granted waivers for exceptions to policy in various pay matters.[3] Plaintiff does not take the position that these decisions are precedential in any way, but merely sets them out as illustrating the routine nature of the action the Board took in the instant case, and as illustrating "the broad latitude given correction boards to remove error and correct injustice." Jeffrey M. Glosser & Keith A. Rosenberg, Military Correction Boards: Administration Process and Review by the United States Court of Claims, 23 Am.U.L.Rev. 391, 408 (1973).

In all of the following cases, the Board found that the applicant had presented sufficient relevant evidence to demonstrate the existence of a

[3] *See also* Sonnenfeld v. United States, 62 Fed. Cl. 336 (2004), for an indication that the "exception to policy" is an acknowledge part of the administrative scheme. In Sonnenfeld a retention officer submitted a "request for exception to policy" on behalf of a service member who sought eligibility for a student loan program. When the request was denied, the service member filed a Tucker Act claim. Id. 337.

probable error or injustice. In Docket No. 00-01988 (Case 4)[4] (14 December 2000), Plaintiffs' Appendix pp. 44-49, the Board granted the applicants request that his 1405 date be recomputed to reflect additional active service, even though he could not return to and did not intend to return to active service, after he had been forced into early retirement following a nonselection for promotion that was subsequently reversed. In Docket No. 00-00105 (Case2) (23 July 2001), Plaintiffs' Appendix pp. 50-55, where it was reasonable to believe that the applicant had relied to his detriment on erroneous advice of DoD personnel and had delayed filing for early retirement, the Board recommended that the applicant's record be corrected to show that as an exception to policy he had in fact applied for early retirement and that his application had been approved. In Docket No. 00-02254 (06 February 2001), Plaintiffs' Appendix pp. 56-59, where the service member died with 19 years, 9 months and 25 days toward retirement, the Board recommended that his records be corrected to show the additional points necessary to gain credit for 20 years of service. In Docket No. 02—01500, (09 October 2002), Plaintiffs' appendix pp. 60-65, where a reservist had retired after he was erroneously told that he was eligible for retired pay, the Board recommended that the applicant be credited with additional points necessary to make him eligible for Reserve retirement.

The above-cited instances, and others not set out here, show that the Board considers its mandate to include the correction of injustices even when the remedy for injustice requires the Board to grant limited exceptions to policy in the

[4] The applicants are anonymous in the publicly available report of the Board's decisions.

form of waivers of eligibility criteria. In most of the instances, the records indicate that the relief awarded by the Board was allowed to stand. See "Memorandum for the Chief of Staff" appended to the first three decisions cited. In Docket No. 02-01500 (09 October 2002), however--the last decision cited above--the Assistant Secretary for Manpower and Reserve Affairs, acting for the Secretary, overruled the Board's decision, as did the Assistant Secretary in the instant case. In the 2002 case, citing Congressionally-established eligibility criteria, the Assistant Secretary concluded as follows: "[A]bsent substantive evidence of miscounseling by responsible Air Force personnel, I am compelled to deny his request." Memorandum for the Executive Director. Docket No. 02-01500, at p. 5.

The inescapable reality is that the Corrections Boards, charged with an "abiding moral sanction", Yee v. United States, 206 Ct. Cl. 388, 512 F.2d 1383, 1388 (1975), to remedy injustice in cases within their purview, often do justice by awarding credit for "fictional" service–to use the Defendant's language—in appropriate cases. (*See* Glosser & Rosenberg, *supra,* at 407, commenting on a case where an applicant sought relief after he had been misinformed about his service record: "Correction boards are likely to be responsive to such claims when the applicant can demonstrate that it was reliance upon erroneous information provided by the service which prompted his decision to retire prematurely.") The fact that the Secretary may sometimes overturn such a decision does not support a conclusion that such Board action is never authorized. In the 2002 board case and in the instant case, the Secretary's

delegate reversed because s/he found the evidence of miscounseling insufficient--thereby clearly implying that in cases where the evidence of miscounseling was sufficient, corrections involving "fictional" service would be upheld. Of course, there will remain on judicial review the question whether the agency decisionmaker acted arbitrarily or abused her discretion, just as there would if the Board had rejected Plaintiffs' request in the first instance. Nevertheless, it is clear that the corrections boards apply a "'liberal standard . . . , pursuant to which the boards have the power, and the . . . duty, to remove injustices and correct errors. . . .[T]he Court has held that when the board has discretion and unreasonably refuses to exercise that discretion, judgment will be entered for plaintiff." Glosser & Rosenberg, supra, at 420-421 and n. 149-152, *quoting* Skaradowski v. United States, 200 Ct. Cl. 488, 489, 471 F.2d 627, 628(1973) and *citing* Duhon v. United States, 198 Ct. Cl. 564, 568, 461 F.2d 1278, 1282 (1972).

In Eastport Steamship Corp. v. United States, 178 Ct.Cl. 599, 605-07, 372 F.2d 1002 1007-08(1967), the Court of Claims noted that one group of cases that came within the Tucker Act was that group "where no payment has been made, [and] the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. . . . The . . . category includes the varied litigations in which . . .some specific provision of law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet."

The instant case is such a case. The Plaintiffs reasonably relied on what turned out to be significant misinformation about the retired pay they would receive if they retired early under the TERA program. They were misinformed because the Air Force failed to discharge its duties under statutory and regulatory mandates. The Plaintiffs were compelled to act under extreme time pressure, AR1 at 39; AR2 at 39, and were deprived of the opportunity to make an informed choice or to revise or retract their decision at a later time. The records corrections procedure, incorporated into the retirement pay system, and seen in conjunction with the web of the Air Force's duties under the retirement pay system, "**embodies a command**" to compensate the Plaintiffs when this type of injustice is substantiated. Specific provisions of law, expressly and impliedly, grant the Plaintiffs a right to be paid compensation necessary to cure the unique injustice they suffered. These provisions, then, are money-mandating within the accepted legal definition.

**B. The Military Correction Boards Statute, 10 U.S.C. § 1552, is money-mandating in this case where the Plaintiffs claim that the Secretary has improperly failed to correct an error or injustice.**

The corrections board statute, 10 U.S.C. § 1552, is a money-mandating statute because it too is reasonably amenable to the interpretation that it mandates a right of recovery in damages and "contemplates compensation in money for violation of the government's duty".

Defendant's assertion that, because it uses the word "may", the statute permits only discretionary payments and cannot be "mandating", Def. Motion 15, is unsupportable. Defendant misconstrues "may" in § 1552 to be language that allows the Secretary the option, when faced with injustice, of granting relief or not. In fact, it is clear the Board, and thus the Secretary, have the duty to act in the face of injustice. Duhon v. United States, 198 Ct. Cl. 564, 461 F.2d 1278, 1280 (1972). In Sanders v. United States, 219 Ct. Cl. 285, 594 F.2d 804 (1979) (cited also by Defendant at p. 14 of its Motion) the Court observed that even though 10 U.S.C. § 1552 confers discretion on the service Secretaries, they have "the authority and duty to correct records in order to correct an error or remove an injustice and to pay money found to be due when payment is necessary to correct a particular error or injustice. We have reviewed correction board actions in terms of the liberal mandate of the statute to correct errors and remove injustices, and failure to follow the purpose of the statute has been remedied in this Court. . . ." 594 F.2d at 812. The implication of Defendant's argument here is that Corrections Board decisions that did not award damages would not be subject to judicial review, an unsupportable conclusion.

Defendant's further assertion that in any event the statute is money-mandating only when a board corrects a record but fails to pay what becomes due the plaintiff, Def. Motion 16-17, is similarly misguided. As the Fisher Court stated, referring to another money-mandating statute, "The fact that the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those

requirements have a right to the money the statute provides. **It is the statute, not the Government official, that provides for the payment.** If the Government official's determinations under the statute are in error, the Court is there to correct the matter, and to have the proper determinations made." 402 F.3d at 1175 (emphasis added).

Defendant's reliance on Martinez v. United States, 33 F.3d 1295 (Fed. Cir. 2003), is also misplaced. The Martinez Court was called upon to deal with a statute of limitations issue, and the majority held that the statute of limitations applicable to a service member's Tucker Act claim was not suspended while the plaintiff pursued a remedy from a corrections board. The majority held that a new cause of action separate from the Tucker Act claim did not accrue to plaintiff when the corrections board rendered its administrative decision on the matter. It is clear that the Martinez decision was focused on the statute of limitations issue, and is not controlling on the issue in the instant matter. In fact, the Martinez majority, criticizing the dissenters' analysis, stated that the dissent's theory "conflates the remedy granted by the correction board statute with the underlying cause of action". Id. at 1314. Seen from that perspective, the majority decision in Martinez does not support the proposition that for all purposes §1552 is not money-mandating. In fact, the majority's acknowledgement that § 1552 **grants a remedy** supports the conclusion that it **is** a money-mandating statute. Where, as here, no statute of limitations issue with its attendant policy concerns is involved, Martinez is limited to its facts and does not control.

Consequently, the Martinez dissent represents the better view of the "money-mandating" issue in this case. There the dissenters stated:

> Section 1552 . . . provides for the correction of military records and for payment of claims incident thereto. The statute authorizes the Secretary of a military department to correct any military record . . . "when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). . . . Importantly, subsection (c) provides that the Secretary 'may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or **other pecuniary benefits** , or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the claimant.' In other contexts we have held that a statute using the term "may" rather than "shall" is nevertheless "money-mandating." . . . . [T]he Secretary [of the Army] has adopted regulations . . . establishing the . . . Board . . . and the procedures governing the Board's activities. . . . [T]he Director, [DFAS], is responsible for settlement of monetary claims arising from activities of the Correction Board. . . .Read together, these provisions of statute and regulations leave little doubt that the decision of the Board has direct consequences regarding an applicant's **monetary remedy.** A favorable result before the Board mandates that the applicant be paid any monies due him; no discretion exists in the hands of the paymaster . . . . This clearly meets the test set out [in Testan] by the Supreme Court: "the asserted entitlement to money damages depends upon whether any federal statute [or regulation] 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (emphasis added; citations omitted).

Martinez, 33 F.3d 1295, 1323-1324 (Plager, J., dissenting; joined by Mayer, C.J., Newman, Gajarsa, Linn, and Dyk, JJ).

In this case, the Plaintiffs have alleged that they have suffered an injustice as a result of the Air Force's unexplained failure to provide them with correct information at the time they were required to make their retirement application, , and the continuing failure to provide them with the necessary information that

would have helped them avoid the harm they incurred when they retired without a credible estimate of their retired pay. They availed themselves of procedures set out under 10 U.S.C. § 1552 and Department of Defense Instruction 1336.6, Correction of Military Records (1994), see Plaintiff's Appendix 66-69, and Air Force Instruction 36-2603, Air Force Board for Correction of Military Records (1996), see Appendix to Def.'s Motion. As the Martinez majority **and** dissent noted, this statutory and regulatory scheme creates a monetary remedy. Plaintiffs argue that the Court should conclude that the provision of law here are money-mandating.

**C. The Court has subject matter jurisdiction over this claim for compensation related to retirement under money-mandating statutes because the Plaintiffs' retirements, which were the result of misleading retirement counseling, cannot be presumed to be voluntary.**

Defendant incorrectly argues that this Court lacks subject matter jurisdiction over Plaintiffs' claims because they voluntarily retired. Although the Court of Federal Claims generally lacks subject matter jurisdiction over a military pay case where the plaintiff has voluntarily retired, and although there is a rebuttable presumption that a retirement is voluntary, Longhofer v. United States, 29 Fed.Cl. 595, 601 (1993), the Court may find that retirement is involuntary if it is the result of misrepresentation by government officials. Tippett v. United

States, 185 F.3d 1250, 1255 (Fed. Cir. 1999). The determination is an objective one and is made by examining the totality of circumstances to determine whether the individual "truly had an option." Longhofer at 601.

In Scharf v. Department of the Air Force, 710 F.2d 1572 (Fed. Cir. 1983), a civilian employment case[5], the Federal Circuit Court found that even where an individual did not contend that he was forced to retire, the retirement could be found to be involuntary because he reasonably relied on a material--albeit unintentional--misstatement and inadequate counseling by persons who the petitioner alleged had a duty to provide retirement counseling. The Scharf Court summarized the pertinent conduct as follows:

> The record clearly indicates that petitioner's failure to understand was due to the fact that he was misled as to the consequences of his optional retirement by the agency counselor . . . . The presiding official found that the petitioner could have reasonably concluded from [the counselor's] statement that he would be put back on the rolls and allowed to use his accumulated sick leave once his disability retirement was approved. We agree. We believe that this statement was highly misleading and materially affected the petitioner's decision regarding retirement. . . [I]t was reasonable for petitioner to rely on the advice of his retirement counselor, and he did in fact rely on this advice in good faith.

710 F.2d at 1575

As in Scharf,--and in contrast to the scenario in Longhofer, 29 Fed.Cl at 603, where the Court found no evidence of a material misstatement--the Plaintiffs

[5] In Sammt v. United States, 780 F.2d 31 (Fed. Cir.1985), "the Federal Circuit recognized the applicability of the involuntariness analysis of civilian personnel separations . . . to military personnel separations." *See Sammt*, 780 F.2d 32." Lynn v. United States, 58 Fed.Cl. 797 (2003).

have alleged that the retirement counseling they were given by Air Force personnel who had a mandatory duty to provide the counseling contained material misstatements on which they reasonably relied when making their early retirement decision. See, e.g., Cplt ¶¶ 7, 12, 19. Further, the administrative record here contains ample evidence to support these allegations and to rebut any presumption of voluntariness. As the Federal Circuit Court stated in Covington v. Department of Health and Human Services, 750 F.2d. 937 (Fed.Cir.1984), addressing a situation where the agency provided erroneous and misleading information that forced the employee to make the retirement decision with incomplete information: "[T]he law . . . requires that a choice . . must be understood by the employee and that such a decision be freely made. In this case, the agency was responsible for [the employee]'s lack of an informed choice. A decision made 'with blinders on', based on misinformation . . . cannot be binding as a matter of fundamental fairness and due process...." Id. at 942-43.

The misinformation provided here to the Plaintiffs prevented them from making an informed choice as to whether to continue their military career. The Plaintiffs have justifiably described this decision as "life-changing", as acknowledged by the AFBCMR. AR1 at 7; AR2 at 6.

The defendant argues that the Plaintiffs could not have reasonably relied on the estimate of their retired pay because when they signed the retirement checklist the retired pay estimates that accompanied it contained a disclaimer and notification that they should contact DFAS-Cleveland for an official estimate

of their retired pay, presumably based on the use of the Section 1405 date. Most tellingly, however, it does not appear that DFAS-Cleveland ever did in fact make this calculation until the retirement date was imminent or perhaps past. As the record shows, Plaintiff Cort Ancman had not received his retirement orders at the time the Plaintiffs were scheduled to move to their belongings to a new home, and in the absence of retirement orders, which could not be issued without a Section 1405 date, an alternative document had to be issued to help him accomplish this. AR1 at 68; AR2 at 65.

In the case where a service member is not retiring early, but is slated to retire for length of service after twenty years of service, regulations require the 1405 date to have been calculated at the 18-year mark. AR1 at 26; AR2 at 23. Presumably, the Air Force had a comparable duty to establish a 1405 date for TERA early retirees in a comparably expeditious manner. Finally, the Air Force evaluator who reported to the AFBCMR acknowledged that the failure to calculate the Plaintiff's retirement pay with the correct date was unexplained. AR1 at 26; AR2 at 23. The Plaintiffs have stated that they called DFAS-CL and could get no response from that office. It is clear that even if the Plaintiffs had gotten through to DFAS-CL, they would have gotten no better information than they got originally. Plaintiffs were not told why it was not possible to calculate the 1405 date and not possible to make sure that early retirees got retired pay estimates that were close to the claimed accuracy of the average retired pay estimate, i.e., "within a few dollars". Cplt. ¶ 7. The system simply failed in this

instance, and it failed in a manner that was beyond the Plaintiffs' control, and in a manner that was totally within the control and responsibility of the Air Force.

The retirement checklist avowal of receipt of an estimate, AR1 at 29; AR2 at 26, and the disclaimer language included in the Pentagon MPF pay estimate, AR1 at 16; AR2 at 15, were essentially meaningless. The Plaintiffs were told contemporaneously by personnel at the Pentagon MPF that the estimate was accurate within a very few dollars. In this instance, Plaintiffs' evidence and Defendant's evidence essentially prove the same thing. Plaintiffs have declared that they were told the estimate was accurate within "one or two dollars". Defendant provided evidence that Air Force personnel said that computer-generated estimates are accurate with "a few dollars." Plaintiffs strenuously argue that this evidence represents a distinction without a difference, and that--even accepting the Defendant's version of the facts--no reasonable person would contemplate the possibility that "a few dollars a month" could mean "a few hundred dollars a month".

The Air Force assumed the responsibility for creating credible retired pay estimates, and the Plaintiffs' evidence of the oral statement made by the Pentagon MPF personnel cannot be ignored. It formed an essential part of the retirement counseling that Plaintiffs received. An "estimate" is meaningless if it is wildly at variance with the final figure, **and** if it varies wildly because the individuals charged with generating the estimate failed to follow the correct procedures by failing to generate and use the basis for computation.

**D. Defendant's motions to dismiss Plaintiffs' Tucker Act claim for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted should be denied.**

Plaintiffs have adequately alleged and pleaded a claim under provisions of law that are money-mandating, and they have shown that their claim fits within the scope of the money-mandating source of law. Fisher, 402 F.3d at 1175-76. Defendant misconstrues the Plaintiffs' arguments when it asserts that Plaintiffs claim that they are entitled to retirement pay that they do not deserve or to which they are not statutorily entitled. They have claimed that the Air Force's miscounseling and misstatements, departure from regular procedure, and breach of the duty to provide adequate retirement counseling, deprived them of the opportunity to make an informed choice. They were deprived of the ability to evaluate their options, including the option to eschew early retirement or to withdraw their retirement decision entirely. Once they had committed themselves to the early retirement choice, they were essentially at the mercy of the Air Force, because they never received (and, as it turns out, never could have received) a legitimate and credible estimate of their retirement pay. A combination of time pressure, the Air Force's monopoly on information, and the Air Force's failure to provide adequate information during the retirement counseling process, put them in a straitjacket-- "with blinders on"-- with regard to their retirement decision. It is this *injustice*, this deviation from fundamental fairness, that they argue entitles them to the compensatory payments that the

AFBCMR initially awarded them and that are contemplated by the statutory and regulatory provisions that govern military retirement pay. Defendant's motions should be denied.

## II. Plaintiffs are entitled to judgment on the administrative record. The Assistant Secretary's decision to reject the AFBCMR's recommendation and deny Plaintiffs' petition was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence in the administrative record. Substantial evidence in the administrative record supports the Board's recommendation that the Plaintiffs be awarded compensation to cure an injustice.

The final authority regarding requested corrections to military records is not the Board—here the AFBCMR—but the Secretary. Strickland v. United States, 423 F.3d 1335, 1342 (Fed. Cir. 2005). The standard of review the Court employs here where the Board recommended compensation and the Secretary disagreed is whether the Secretary's rejection of the Board's recommendation was arbitrary or capricious, unsupported by substantial evidence, or otherwise contrary to the law." Id. at 1343. This is the same standard the Court applies where the Board rejects an applicant's petition. See, e.g., Sanders, 594 F.2d at 811.

Although the Secretary, through the Assistant Secretary here, was not bound to accept the recommendations of the AFCBMR, the Assistant Secretary, nevertheless must state the basis for her denial in writing. AFI 36-2603. The decision here was arbitrary and capricious because she failed to consider relevant factors and disregarded the substantial evidence in the administrative record that supported the Board's recommendations. In particular, the Assistant Secretary here stated: "I note the assertion that they were told by the Pentagon MPF that though the pay estimator was not exact, it was within $1 - $2 of what they would be getting in retired pay and, therefore, there was no need to contact DFAS because they could not provide a better estimate without the 1405 date. However, I find no evidentiary support for this assertion from the Pentagon MPF. Absent corroborative evidence from the Pentagon MPF or an indication that the applicants were provided inaccurate estimates of their retired pay from DFAS, I find no compelling basis to provide them additional retirement benefits for periods of service in which they did not serve." AR1 at 10; AR2 at 9.

Plaintiffs first reiterate their assertion that the last sentence reaffirms Plaintiffs' earlier contention that the Assistant Secretary was impliedly acknowledging that **if** she determined the evidence was sufficient to show misleading inaccurate information had been provided she would have approved the Board's recommendation. Beyond that, the Assistant Secretary in fact ignored evidence in the record that **did** corroborate the Plaintiffs' statement. That is, the evidence that Air Force personnel, including those responsible for using the computer model to produce retired pay estimates, generally

acknowledged and professed that the estimates were accurate within "a few" dollars is evidence that tends to prove the same things Plaintiffs' evidence proves—that the estimates were expected to be very close indeed to the final figure. The AFBCMR itself, in its decision, stated: "We believe the applicant was led to believe that there would be **a small difference** between the estimate and her actual retire pay and based on that belief, she made a life changing decision." AR1 at 7; AR2 at 6.

Furthermore, the Assistant Secretary concludes that it is "inexcusable" that the Plaintiffs did not "seek official confirmation" of the estimates from DFAS. AR1 AT 10, AR2 9. The Plaintiffs of course have stated that they did contact DFAS, to no avail. Beyond this and as has been pointed out earlier, there is no evidence in the record to support the Assistant Secretary's assumption that the Plaintiffs failed to do what they could to confirm the estimate. The record does not reveal when 1405 dates were in fact calculated. It is clear that Plaintiff Cort Ancman's 1405 date remained uncalculated at the time he was attempting to move to his post-retirement home. A substitute document was issued to him because there was no 1405 date calculated. AR1 at 68; AR2 at 65.

Finally, the Assistant Secretary admits that the Pentagon MPF provided Plaintiffs with "grossly inaccurate" estimates, but dismisses the impact of that factor because the Plaintiffs were given the "address of the proper source to obtain official estimates." AR1 at 9-10; AR2 at 8-9. Again, the Assistant Secretary has concluded that official estimates were available from DFAS-CL, a factual conclusion unsupported by the administrative record. In fact, the record

as a whole provides no support for the Secretary's assumption that an accurate official estimate was available. Included as part of the Board's decision, the Air Force Evaluation notes that Retirements Branch Personnel had not computed the 1405 date, even though it was responsible for doing so. AR1 AT at 5. "The Pentagon MPF could not provide the applicant with a correct estimate without the official 10 USC 1405 date. . .**For reasons they cannot explain**, both MPFs [Pentagon and Nellis] substituted the applicant's pay date for the 10 USC 1405 date. . . .

There is no evidence to support the Assistant Secretary's conclusion that the Plaintiffs had a source of "official" or accurate information that could cure the errors made during the retirement counseling process. The pattern of performance established by the administrative record, where misinformation was inexplicably given and the duty to produce and provide accurate information was breached, is one of irregularity and laxity. If there is a presumption of regularity or presumption that these public officials discharged their duties, correctly, lawfully, and in good faith, Hoffman v. United States, 894 F.2d 30 (Fed. Cir 1990), that bubble has been burst where the evidence of on the administrative record shows that the Air Force here failed to provide the Plaintiffs with the accurate information that was indispensable if they were to make an informed choice about retirement.

The Assistant Secretary's decision is reviewable by this Court, despite Defendant's caveat. Def. Motion, 18, 21 and n. 9. Defendant argues that the Assistant Secretary's approval of payment to the Plaintiffs would violate the

Appropriations Clause of the U. S. Constitution, according to the principles set out in OPM v. Richmond, 496 U.S. 414 (1990), and the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(B). Plaintiffs do however point to authority for payment to them of the compensation the Board recommended. First, as Justice Stevens stated in Richmond, " [E]ven . . . in . . . cases [that] are the product of a mistaken interpretation of a statute or regulation . . .[t]he Constitution contemplates appropriations that cover programs—not individual appropriations for individual payments." 496 U.S. 414, 435 (1990). By analogy, the general appropriations for military retired pay cover the program that determines the retired pay for Air Force officers. As noted above, in instances where the Board has granted exceptions to policy, the Board in effect waives established criteria and triggers payment under terms that may vary from statutory and regulatory criteria. Furthermore, 10 U.S.C. § 1552 provides statutory authority for payment of this and any lawful compensation granted by a corrections board: "The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if as a result of correcting a record under this section, the amount is found to be due the claimant on account of his or another's service . . ." 10 U.S.C. § 1552(c). It is clear that in any case where there is a final decision correcting a military record under 10 U.S.C. § 1552, a statute authorizes payment. Plaintiffs have argued that money-mandating provisions of law create a remedy and that their claim comes within its scope. The Board's award of compensation to them is authorized by statute.

The evidence in the administrative record shows that the Assistant Secretary ignored relevant factors, and made factual findings and conclusions that were not supported by substantial evidence. Conversely, the administrative record contains substantial evidence to support the decision made by the AFBCMR that awarded Plaintiffs a monetary remedy for the injustice that they suffered in connection with their decision to take early retirement. The Court should reverse the Assistant Secretary's decision, reinstate the Board's decision and enter judgment on the administrative record for the Plaintiffs.

## CONCLUSION

Plaintiffs respectfully request that the Court deny the Defendant's motions to dismiss and for judgment on the administrative record and grant their cross-motion for judgment on the administrative record and enter judgment in their favor.

Respectfully submitted,

s/ Margaret K. Krasik, Esq.

Attorney for Plaintiffs

600 Forbes Avenue
Pittsburgh, Pa. 15282
Telephone: 412-396-6302
Fax: 412-396-4014
Email: krasik@duq.edu

February 5, 2007

# PLAINTIFFS'

# APPENDIX

**CHAPTER 18**

**MILITARY TEMPORARY EARLY RETIREMENT AUTHORITY PROGRAM**

1801 OVERVIEW

180101. Purpose. This chapter provides procedures for funding, accounting for, disbursing, and reporting retirement payments for those members chosen for early retirement under the provisions of section 4403, Public Law 102-484, National Defense Authorization Act for FY 1993.

180102. General. Public Law 102-484, National Defense Authorization Act for FY 1993, provided the Secretary of Defense a temporary additional force management tool with which to effect the drawdown of military forces. Subsection 4403(f) of the Act directs the use of a subaccount within the budget activities in the Active, Reserve and Guard Military Personnel Appropriations for retirement payments to members participating in the Temporary Early Retirement Authority (TERA) Program. The use of the TERA Program was extended through the end of FY 1999 by the National Defense Authorization Act for 1994, Public Law 103-160.

1802 POLICY AND PROCEDURES

180201. Subject to the availability of appropriations for purposes set forth in section 4403, the Secretary of each Military Department shall provide for the payment of retired pay amounts, beginning in FY 1993, to active service military members who retire up to 5 years before the completion of a 20-year period of service.

180202. When a military member retires early under authority of section 4403, an amount that is sufficient to cover the retired pay (with appropriate reductions if the Survivor Benefit Plan is elected) and cost of living adjustments (COLAs) until the member would have reached 20 years of service shall be obligated in the subaccount established in the applicable Active, Reserve or National Guard Military Personnel Appropriation. After that time, the member's retirement pay shall be funded from the Department of Defense Military Retirement Fund (97X8097). The funds included in the subaccount shall be provided in the fiscal year in which the applicable member retires. For example, assume that a TERA retiree's monthly gross retirement pay is $1000 with an Survivor Benefit Plan (SBP) amount of $100. Based on the computation referenced above, the amount to be obligated would be $900 for each month plus cost of living adjustments (COLA) until the member would reach 20 years.

180203. Deductions from retired pay of TERA retirees who elect SBP are treated no differently than similar deductions in the case of retirees who retire after 20 years or more of service. There is no provision in the law for transferring amounts into the DoD Military Retirement Trust Fund equaling such reductions.

180204. There is no provision in the law that would require contributions to the Department of Defense Military Retirement Trust fund to be calculated any differently as a result of TERA. If the Board of Actuaries determines that an unfunded liability exists as a results of a change in member benefits, it would establish a proper amortization schedule pursuant to 10 U.S.C. Section 1465(c)(2), and payments into the fund would be adjusted accordingly (10 U.S.C. Section 1466 (b)(2)(B)).

180205. The required subaccounts, within the Active, Reserve and National Guard Military Personnel Appropriations, will be established for each Military Department, for each fiscal year. Amounts included in this subaccount shall be for those members that were chosen for early retirement under the provisions of section 4403. Such amounts shall be sufficient, and made available, to pay the retired members for their entire "initial period" of entitlement up to the time that responsibility for their retired pay payments is funded by the Department of Defense Military Retirement Fund (97X8097). The "initial period" is the number of years (and any fraction of a year) equal to the difference between 20 years and the number of years of service for retirement eligibility completed by the member at the time the member retired under the authority of section 4403.

180206. The Secretary of each Military Department shall provide funding for a member's initial period from amounts included in the subaccounts. The amounts included in the subaccounts shall remain available for payment in accordance with section 4403(f) of Public Law 102-484 and Title 31, United States Code, section 1553(a).

1803 RESPONSIBILITIES

180301. Secretary of each Military Department. The Secretary of each Military Department, or designee, shall:

A. In conjunction with the Office of the Deputy Comptroller (Program/Budget) (ODC(P/B)), OUSD(C), establish a subaccount entitled "Temporary Early Retirement Pay" within (1) the Pay and Allowances of Officers or Pay and Allowances of Enlisted budget activity, as applicable, for the Active Personnel Appropriations, and (2) Other Training and Support budget activities for the Reserve and National Guard Personnel Appropriations.

B. In conjunction with the ODC(P/B), establish separate subaccounts in the Active, Reserve and National Guard Personnel Appropriations for FY 1993, FY 1994, FY 1995, and October 1, 1995 (one day of FY 1996).

C. Provide for funding in the Active, Reserve and National Guard Personnel Appropriations to pay members who were approved for "early retirement" under the provisions of section 4403, Public Law 102-484.

D. As appropriate, identify to the ODC(P/B), the number of military personnel entitled under the TERA Program.

E. Identify, in budget submissions to the ODC(P/B), the number of military personnel and the appropriate funding source to pay retired personnel selected for early retirement.

F. In conjunction with the ODC(P/B), prepare appropriate funding guidance, as needed, to operate the TERA Program.

180302. Under Secretary of Defense (Personnel and Readiness) (USD(P&R)). The Under Secretary of Defense (Personnel and Readiness) shall provide, as a minimum, annual reports to ODC(P/B) Operations Directorate identifying the number of military members scheduled to retire in the forthcoming fiscal year under provisions of the TERA Program. The first report shall be provided in sufficient time to ensure that funding is available to establish the subaccount during the last quarter of FY 1993.

180303. Office of the Deputy Comptroller (Program/Budget). The ODC (P/B) shall:

A. Review the Military Departments' budget submissions for reasonableness and accuracy.

B. Ensure that the various budget submissions include the appropriate numbers/costs for the TERA Program.

180304. Defense Finance and Accounting Service. The Defense Finance and Accounting Service (DFAS) shall:

A. In conjunction with the Military Departments, ensure that obligations are established in the accounting systems when funds for the "early retirees" are transferred to the appropriate subaccounts.

B. Establish appropriate controls within the accounting systems to perform normal accounting and reporting functions for the TERA Program.

C. Ensure that the subaccount(s) and the appropriate line(s) of accounting for each Military Department are provided to the appropriate DFAS Center.

D. Ensure that fiduciary, fund status and financial management reports are prepared to coincide with reporting for the Active, Reserve and National Guard Personnel Appropriations.

FOREWORD

This volume of the "Department of Defense Financial Management Regulation" is issued under the authority of DoD Instruction 7000.14, "DoD Financial Management Policy and Procedures," dated November 15, 1992. It governs financial management by establishing and enforcing requirements, principles, standards, systems, procedures, and practices necessary to comply with financial management statutory and regulatory requirements applicable to the Department of Defense. It directs financial management requirements, systems, and functions for all appropriated, working capital, revolving, and trust fund activities. In addition, it directs statutory and regulatory financial reporting requirements.

Volume 7 of the "DoD Financial Management Regulation" establishes policies and procedures for military pay. The volume is divided into three volumes: Volume 7A, "Military Pay Policy and Procedures Active Duty and Reserve Pay;" Volume 7B, "Military Pay Policy and Procedures for Retired Pay;" and Volume 7C, "Special Military Pay/Personnel Programs and Operating Procedures Manual." Volume 7B, specifically details entitlements for retired personnel, survivor annuitants, and victims of abuse.

This volume of the Regulation applies to the Office of the Secretary of Defense, the Military Departments, the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Inspector General of the Department of Defense, the Defense Agencies, and the DoD Field Activities (hereafter referred to collectively as "DoD Components").

This volume of the Regulation is effective immediately and is mandatory for use by all DoD Components. Heads of DoD Components shall ensure that the provisions of this Volume are adhered to in day-to-day operations and in the design, modification, and maintenance of their Components' financial management and reporting system or systems. The Heads of DoD Components shall not issue supplementary directives and/or regulations without the prior written approval of the Office of the Under Secretary of Defense (Comptroller).

The reporting requirements in this Regulation are exempt from licensing in accordance with paragraph E.4.f of DoD 8910.1-M, "DoD Procedures for Management of Information Requirements," November 1986.

Recommended changes to, and requests for deviations from or exceptions to, the provisions of this volume of the Regulation should be forwarded through appropriate chain of command channels along with specific justification to:

Office of the Under Secretary of Defense (Comptroller)
Office of the Deputy Chief Financial Officer
1100 Defense Pentagon
Washington, DC 20301-1100

All 15 volumes of the "DoD Financial Management Regulation" are available on the Internet at: http://www.dtic.mil/comptroller/fmr/. Printed or CD-ROM copies of the Regulation may be purchased through the Internet Homepage or directly from the Defense Automated Printing Service, at 1401 S. Fern Street, Arlington, VA 22202, or by telephone at (703) 607-5212.

William J. Lynn

## CORRECTION OF RECORDS

1001 AUTHORITY

100101. The Secretary of a Military Department, under procedures established by that Secretary and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that Military Department, may correct any military record of that department when the Secretary concerned considers it necessary to correct an error or remove an injustice.

100102. Corrections of military records are final and conclusive on all officers of the United States except when such corrections were obtained through fraud.

100103. If there is a proper correction and a right to the payment of money as a result of that proper correction, there must be a change of facts as set out in the original record, or an addition or deletion of a fact. A reaffirmation of existing facts already in the original record does not constitute a proper correction of that record. A recital of existing facts does not avoid the operation of a statute of limitations. The statute of limitations on a proper correction of the record begins to run from the date of the correction. Example: A member of the Naval service is transferred to the Fleet Reserve or the Fleet Marine Corps Reserve. If his or her record is corrected to show additional service credits, the 6-year (10 years before July 1975) limitation period starts from the date of the record correction rather than from the date of the transfer. Upon correction, the member is entitled to retainer pay from the date of transfer in accordance with his or her grade and number of years of creditable service, as corrected.

100104. Corrections may be made when:

A. The member, the member's heir, or legal representative filed a request before October 26, 1961, or within 3 years after member has discovered the error or injustice, whichever is later, or

B. The Board excuses a failure to file within 3 years when it is in the interest of justice.

1002 PAY COMPUTATION

100201. Payments based on a correction of military records must be made in the amounts determined to be due by applying pertinent laws and regulations to all the material facts shown in the corrected record. Generally, the payments resulting from the correction of military records are based on the:

A. Pay entitlement the member had before the correction,

B. Actual payments made for these entitlements, and

C. New pay entitlements that accrue as a result of the correction. For specific computation, see the chapters concerning the entitlement to and computation of retired or retainer pay, and participation in and payment of survivor annuities under the Retired Serviceman's Family Protection Plan (RSFPP) and/or the Survivor Benefit Plan (SBP).

100202. The settlement of retired pay, retainer pay, or survivor annuities due as a result of the correction of a military record must be reduced, as applicable, by:

A. Any previous settlements of active duty pay and allowances involving the same periods.

B. Prior payments of readjustment pay or disability severance pay.

C. Prior payments of disability compensation, pensions, or Dependency and Indemnity Compensation (DIC) made by the Department of Veterans Affairs.

D. Federal income tax.

E. Cost of participation in the RSFPP and/or SBP.

F. Prior to [Insert effective date], dual compensation statutes if a retired Regular officer was employed by the United States Government.

G. Prior payments of the mother's benefit received from social security and the amount of the spouse's social security entitlement, if any, resulting from the retiree's active military service.

★ 100203. Earnings received from civilian employment, self employment, or any income protection plan for such employment during any period for which active duty pay and allowances are payable will be deducted from the settlement. To the extent authorized by law and regulation, amounts found due shall be reduced by the amount of any existing indebtedness to the government arising from military service.

100204. When payment cannot be made to the member because of member's death, payment may be made to member's legal representative. In the absence of a demand for payment by the legal representative, payments are made:

A. To the surviving spouse, heir, or beneficiaries, in the order prescribed by the law applicable to that kind of payment,

B. In the order of precedence in Chapter 30 or if there is no such law covering order of payment,

C. As otherwise prescribed by the law applicable to that kind of payment.

100205. A claimant's acceptance of settlement fully satisfies the claim concerned. Settlement of this claim does not preclude payment of a separate and distinct claim and acceptance of settlement does not preclude recomputation and adjustment when there is a mutual mistake. Payments are not authorized for any claim compensated by private law before October 25, 1951.

## 1003 TAX ADJUSTMENT

See section 2412 of this volume.

## 1004 APPROPRIATION CHARGES

The payments that become due and payable as a result of the correction are charged to the applicable current retired pay appropriation for all amounts due on and after the date of approval by the Secretary concerned. Amounts due for periods before the date of approval by the Secretary of the Military Department concerned (or designee) are charged to the Claims, Department of Defense appropriation.

## 1005 RESTRICTIONS

No payment resulting from a correction of records may be made for a benefit to which the claimant might later become entitled under the laws and regulations administered by the Secretary of Veterans Affairs.

***BY ORDER OF THE SECRETARY OF THE AIR FORCE***

***AIR FORCE INSTRUCTION 36-2604***

***2 DECEMBER 2004***

***Personnel***

***SERVICE DATES AND DATES OF RANK***

**COMPLIANCE WITH THIS PUBLICATION IS MANDATORY**

**NOTICE:** This publication is available digitally on the AFDPO WWW site at: **http://www.e-publishing.af.mil.**

OPR: HQ AFPC/DPPAOR (Rose Mills)

Certified by: HQ AFPC/DPP (Col Steven F. Maurmann)

Supersedes AFI 36-2604, 18 December 2001

Pages: 33
Distribution: F

This instruction explains how to compute service dates and dates of rank and establishes who must compute, record, report, and correct them. It implements Air Force Policy Directive 36-26, *Military Force Management,* and Department of Defense Directive (DODD) 1310.1, 29 April 1996. This publication requires collecting and maintaining information affected or protected by the Privacy Act of 1974. The authority to collect and maintain the records prescribed in this instruction is Title 10, United States Code (U.S.C.), Section 8013, and Executive Order 9397, *Numbering System for Federal Accounts Relating to Individual Persons*, 22 Nov 1943. System of Records Notice F036, AFPC*, Military Personnel Records System,* applies. See **Attachment 1** for Glossary. Process supplements that affect any military personnel function as shown in Air Force Instruction (AFI) 33-360, Volume 1, *Publications Management Program*. HQ AFPC/DPPAOR must review all supplements to this instruction. The Paperwork Reduction Act of 1974 as amended in 1996 affects this instruction. Also, the Air Force Forms Management program in accordance with (IAW) AFI 37-160, Volume 8, *The Air Force Publications and Forms Management Program-Developing and Processing Forms,* affects this instruction.

***SUMMARY OF REVISIONS***

This change incorporates interim change (IC) 2004-1 (**Attachment 3**). This change provides clarification for when service verification is overdue. See the last attachment of the publication, IC 2004-1, for the complete IC. A bar ( | ) indicates revision from the previous edition.

Section A—Service Dates 3

1. Explanation of Service Dates. .......... 3
2. Service Dates Required for Commissioned Officers, Warrant Officers, and Airmen. 3
3. Responsibility for Computing, Recording, and Reporting Service Dates. .......... 3
4. Computing Service Dates. .......... 4

5. Changing Service Dates of Personnel on EAD for Lost Time. ...... 5
6. Processing AF Form 1613. ...... 5
Section B—Current Grade Date of Rank (CGDOR) and Date of Rank (DOR) 6
7. Determining CGDOR of Commissioned Officers on EAD. ...... 6
8. Determining DOR of Airmen on Enlistment or Reenlistment in the Regular Air Force (RegAF). ...... 8
Figure 1. Example of DOR Computation. ...... 8
9. Determining DOR of Reserve Airmen Ordered to or Released From EAD. ...... 9
10. Determining DOR of Retired Airmen Ordered to EAD. ...... 10
11. Determining DOR of Promoted Airmen. ...... 10
12. Determining DOR of Demoted Airmen. ...... 10
13. Determining DOR for Airmen Retrained or Reassigned from Band Duties. ...... 11
14. Adjusting Airman's DOR To Deduct Lost Time. ...... 12
15. Form Prescribed. ...... 12
Table 1. Explanation of Service Dates. ...... 13
Table 2. Required Service Dates For Officers, Warrant Officers, And Airmen. ...... 17
Table 3. Creditable Service For Total Active Federal Military Service Date (TAFMSD), Total Active Federal Commissioned Service Date (TAFCSD), Total Federal Commissioned Service Date (TFCSD), Total Years Service Date (TYSD), Total Enlisted Military Service Date (TEMSD), Pay Date, And 1405 Service Date. ...... 18
Table 4. Creditable Service For Date Of Rank (DOR) Of Reserve Commissioned Officers (see notes 1and 5). ...... 23
Table 5. Minimum Entry Grade Credit for Medical And Dental Corps Officers. ...... 25
Table 6. Minimum Entry Grade Credit For Biomedical Sciences Corps (BSC), Medical Service Corps (MSC), Nurse Corps (NC), Chaplains And Judge Advocate General Department Officers. ...... 26
**Attachment 1— GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION** **27**
**Attachment 2— IC 2001-1 TO AFI 36-2604, SERVICE DATES AND DATES OF RANK** **31**
**Attachment 3— IC 2004-1 TO AFI 36-2604, SERVICE DATES AND DATES OF RANK** **33**

*Section A—Service Dates*

**1. Explanation of Service Dates.** See **Table 1.**

**2. Service Dates Required for Commissioned Officers, Warrant Officers, and Airmen.** See **Table 2.**

**3. Responsibility for Computing, Recording, and Reporting Service Dates.**

3.1. Officers Not on EAD.

3.1.1. United States Air Force Reserve (USAFR) Officers.

3.1.1.1. Headquarters, Air Reserve Personnel Center, Directorate of Personnel, Promotions Branch (HQ ARPC/DPJA) computes and enters into the personnel data system (PDS) the following: DOR, current grade and permanent grade effective dates.

3.1.1.2. The Point Credit Accounting Division (HQ ARPC/DPK) computes and enters into PDS the following: total active federal military service (TAFMS) and total active federal commissioned service (TAFCS).

3.1.1.3. The Directorate of Assignments and Readiness, Sustainment Management Division (HQ ARPC/DAS) computes and enters into PDS: Date Initial Entry Reserve Forces (DIERF), Date Initial Entry Uniformed Service (DIEUS), pay date, TFCSD, and TYSD.

3.1.2. Air National Guard (ANG) Officers. The appointing authority computes and enters all service dates into PDS. ***NOTE:*** HQ ARPC/DAS verifies and corrects pay date, TFCSD, TYSD, DIEUS, and DIERF on ANG members after they are gained on strength for accountability.

3.2. Officers on EAD.

3.2.1. Headquarters, Air Force Personnel Center, Directorate of Personnel Program Management, Personnel Procurement and Development Division, Line Officer Procurement Branch, Officer/ Airman Verification Section (HQ AFPC/DPPAOR) computes and enters into PDS the current grade date of rank (CGDOR).

3.2.1.1. The Directorate of Personnel Program Management, Promotion, Evaluation, and Recognition Division, Officer Promotion and Appointment Branch, Officer Promotion Section (HQ AFPC/DPPPOO) updates the CGDOR on subsequent promotions.

3.2.2. TAFMSD, TAFCSD, TFCSD, Pay Date, TYSD (unless service component is Regular), EAD. HQ AFPC/DPPAOR prepares an AF IMT 1613**, Statement of Service**, on all officers gained to the permanent MPF within 120 days after date arrived permanent duty station and enters the computed service dates in MILPDS. HQ AFPC/DPPAOR forwards one copy of the AF IMT 1613 to the member's servicing Military Personnel Flight (MPF), for file in the member's UPRG, and forwards one copy for file in the member's master personnel record group (MPerRGp).

3.3. USAFR and ANG Airmen Not on EAD. The servicing MPF, and HQ ARPC/DAS and DPJA compute service dates and enter them in PDS.

3.4. Airmen on EAD.

3.4.1. The servicing MPF computes and updates service dates in the PDS for members entering EAD.

3.4.2. The Personnel Procurement and Development Division, Line Officer Procurement Branch, Officer/Airman Verification Section (HQ AFPC/DPPAOR), computes the TAFMSD, EAD, DIEUS, and pay date and forwards one copy of the AF Form 1613 to member's servicing MPF for file in member's UPRG, and files one copy in the MPRGp on:

3.4.2.1. Prior Service Airmen who enlist after a break in service. HQ AFPC/DPPAOR completes AF IMT 1613 within 120 days after date arrived permanent duty station.

3.4.2.2. Reenlisted airmen charged with time lost under Title 10, U.S.C., 972.

3.4.3. The Directorate of Personnel Program Management, Retirements and Separations Division, Retirements Branch, (HQ AFPC/DPPRR) will normally verify service dates at 18 years TAFMS. The statement of service (SOS) generated by that verification is filed in the MPerRGp. However, if a member feels their service dates are not correct prior to the 18-year verification, the MPF should forward AF Form 330, **Records Transmittal/Request**, to HQ AFPC/DPPR for service date verification.

3.4.3.1. Other airmen who are under special projects. Identify such airmen by year groups according to their TAFMSD and provide statements of service.

3.4.3.2. If Defense Finance and Accounting Service (DFAS) disagrees with the service dates, DFAS resolves the problem directly with the office submitting the service dates.

**4. Computing Service Dates.** HQ AFPC, HQ ARPC, and MPF compute service dates**.** **Table 3.** shows the service you may credit when computing the TAFMSD, TAFCSD, TFCSD, TYSD, TEMSD, the pay date, and the 1405 service date. **Table 4.** shows the service you may credit when computing the DOR.

4.1. Do not adjust service dates and dates of rank for officers on EAD before 15 September 1981 because of the Defense Officer Personnel Management Act (DOPMA), except as DOPMA authorizes. Continue to apply regulations in effect before 15 September l981 when you need to verify or adjust these officers' service data.

4.2. Do not adjust service dates and dates of rank for Reserve officers on strength before 1 October 1996 because of the Reserve Officer Personnel Management Act (ROPMA), except as ROPMA authorizes. Continue to apply regulations in effect before 1 October 1996 when you need to verify or adjust these officers' service date.

4.3. HQ AFPC/DPPAOR. Restores service data to the member's original data before separation or discharge when a court order or the Air Force Board for Correction of Military Records directs reinstatement to active duty.

4.4. In computing the TFCSD of USAFR officers, begin with the date they accepted a commission. For ANG officers, start with date of Federal recognition.

4.5. Use **Table 1.**, rules 13 and 14, to determine the DIEUS and DIERF dates.

4.6. In changing service dates for airmen because of lost time (Department of Defense Financial Management Regulation (DoDFMR), 7000.14-R, paragraph 10110):

4.6.1. Adjust the TAFMSD, TEMSD (master sergeant and senior master sergeant only), and pay date by the number of days lost (see paragraph **4.6.**).

4.6.2. Adjust the date of separation (DOS), if no projected extensions exist, and the expiration term of service (ETS), if applicable, on a day-for-day basis. If a person has any projected extensions, adjust the DOS in whole months according to the adjusted ETS.

4.7. In converting months into days and days into months, consider each month as 30 days (including February).

4.8. In subtracting inclusive dates, add 1 day to the remainder.

4.9. If a computed service date is 30 February, record it as 1 March. If a computed service date is 29 February, record it as 29 February, even if the year is not a leap year. See following **EXAMPLE.**

| | |
|---|---|
| Date discharged | 93-03-31 |
| Subtract Date enlisted USAF | 81-11-19 |
| Total Creditable Service | 11-04-12 |
| | |
| Date Entered USAF | 97-07-11 |
| Minus prior creditable service | 11-04-12 |
| Pay Date and TAFMSD | 86-02-29 |

4.10. In computing service between two dates, change the ending date to 30 if it is the last day of the month and it is other than 30. Change 28 Feb to 30 unless it is a leap year. In a leap year change 29 February to 30, do not change 28 February. Never change the beginning date. **NOTE:** If beginning and ending date is 31, subtract and add 1 day to the remainder.

4.11. If a member enters on EAD while on a tour of active duty for training (ADT), or active duty (AD), or on the day after the last day of the ADT or AD tour, do not show a break in active service. Consider TAFMSD and TAFCSD as the first day of the tour and backdate them by previous creditable service.

4.12. In computing the TAFMSD, TAFCSD, TFCSD, TYSD, and TEMSD, include all periods of ADT. For a tour of 30 days or less, count the actual number of days. For longer tours, subtract the first day of the tour from the last day and add 1 day to the remainder. This ensures inclusive dates.

4.13. The DoDFMR 7000.14*,* paragraphs 10107 and 10110, explain how to compute a pay date. Use the same basic computation in computing other service dates.

**5. Changing Service Dates of Personnel on EAD for Lost Time.** (OPR: Personnel Readiness).

5.1. Use AF Form 2098, **Duty Status Change***,* to change service dates resulting from time lost. Forward original copy to HQ AFPC/DPSRI1 for active duty personnel, or HQ ARPC/DSMP, for Reserve/Guard personnel.

**6. Processing AF Form 1613.** If you are in the Career Enhancement element and you receive an AF Form 1613 from HQ AFPC, have the member review it and complete one of the following actions:

6.1. If the member agrees with the service dates on AF Form 1613 and the dates agree with PDS, have member initial AF Form 1613 and file it in the UPRG.

6.2. If the member agrees with the service dates on AF Form 1613 but the dates are not the same as in the PDS, notify HQ AFPC/DPPAOR and file it in the UPRG.

6.3. If the member does not agree with the service dates on AF Form 1613, annotate the AF Form 1613, inform HQ AFPC/DPPAOR, 550 C St West, Suite 10, Randolph AFB TX 78150-4712, and file it in the UPRG pending resolution of the dispute.

***Section B—Current Grade Date of Rank (CGDOR) and Date of Rank (DOR)***

**7. Determining CGDOR of Commissioned Officers on EAD.** HQ AFPC/DPPAOR and DPPPOO determine the CGDOR.

7.1. The CGDOR of a Regular or Reserve officer on an active duty list (ADL) in a grade held as result of a promotion is the effective date of the promotion.

7.2. The CGDOR of a Regular officer on original appointment is the date of appointment, unless: the officer was, at the time of Regular appointment, a Reserve officer on the ADL, in which case the CGDOR is the same as that held by the officer immediately before appointment as a Regular officer or the officer receives service credit, in which case the CGDOR reflects an earlier date determined by the extent to which the service credit exceeds the credit required for the officer's appointment grade.

7.3. Adjust the CGDOR of a retired officer ordered to EAD by adding the period between the retirement date and the effective date of EAD to the CGDOR held at retirement.

7.4. The CGDOR of an officer ordered to EAD from the temporary disability retired list (TDRL) is the same one the officer held before being placed on the TDRL. The EAD order announces the CGDOR.

7.5. The CGDOR of a Reserve officer ordered to EAD in the Reserve grade held (AFI 36-2008, *Voluntary Extended Active Duty (EAD) for Air Reserve Commissioned Officers)* is the EAD date. If an officer has previous commissioned service in an active status, adjust the CGDOR: Backdate the EAD by a period equal to the amount of service credit awarded under paragraph **7.5.1.** ***NOTE:*** This paragraph applies only to Air Force officers not entitled to any constructive service credit at time of EAD.

7.5.1. HQ AFPC/DPPAOR computes service credit as follows:

7.5.1.1. Credit 1 day for each day that the officer performed AD commissioned service including short, special, and temporary tours of AD and ADT defined in AFMAN 36-8001, *Reserve Personnel Participation and Training Procedures,* in the armed forces in the grade in which he or she entered the ADL.

7.5.1.2. Credit ½ day for each day that the officer performed active—but not active duty—commissioned service in the grade in which he or she entered the ADL.

7.5.1.3. Effective 1 October 1996, Reserve officers ordered to active duty and placed on the ADL from the RASL maintain their rank and date of rank. Reserve officers ordered to active duty from the Inactive Status List Reserve Section (ISLRS) will have their date of rank computed IAW paragraphs **7.5.1.**l and **7.5.1.2.**

7.5.1.4. Officers on the RASL, who were selected for promotion by a mandatory promotion board or a special selection board, and who before being promoted are placed on the ADL of the same armed force and in the same competitive category, shall be placed on an appropriate promotion list for officers on the ADL. Effective date of promotion and date of rank shall be the same as if the officer had been selected to the grade concerned by the promotion board for ADL officers.

7.5.1.5. For an officer ordered to EAD in the grade of second lieutenant, credit 1 day for each day that the officer performed active--but not active duty--service, if all of the following conditions apply: the officer was commissioned through Air Force Reserve Officer Training Corps (AFROTC) before 1 July 1992, the officer's EAD was delayed under AFI 36-2009, *Delay in Active Duty for AFROTC Graduates* before 1 July 1992 for full-time instruction in graduate or professional studies, the officer receives the graduate or professional degree before beginning EAD, or the officer's delay terminates because of an order to meet Air Force requirements, in accordance with AFI 36-2009. ***NOTE:*** Do not use this provision when a delay terminates because the officer fails to maintain acceptable academic or retention standards or fails to comply with Armed Forces Institute of Technology (AFIT) requirements as AFI 36-2009 directs.

7.6. HQ AFPC/DPPAOR computes the CGDOR for other than line of the Air Force officers ordered to EAD in a grade established according to AFI 36-2008, table 1, rules 3 through 10, by backdating the EAD date by a period equal to the difference between two categories:

7.6.1. The total amount of entry grade credit authorized at time of EAD (see AFI 36-2008 to determine entry grade credit).

7.6.2. The minimum amount of entry grade credit required in **Table 5.** and **Table 6.** for appointment in the competitive grade.

7.6.3. For an officer designated a Judge Advocate (JA) or assigned as an attorney in the Air Force General Counsel's Honors Program but entering EAD in the grade of captain, the CGDOR is the EAD date (see AFI 36-2008, table 1, note 5).

7.6.4. For a physician appointed in the grade of lieutenant colonel or colonel and ordered to EAD, compute the CGDOR by backdating the EAD date by the period of time the physician spent in an active status in the Reserve grade before EAD.

7.7. Officers who separate from and later return to EAD retain the CGDOR they held at time of separation, provided that one of the following applies: the officer is returning to EAD in the same grade and same competitive category (regardless of branch of service) within 1 year of release or discharge from EAD, or the officer is a Medical Corps (MC) officer returning to EAD after completing a military leave of absence (redeferment) authorized by HQ AFPC/ DPAMF.

7.8. For a Reserve second lieutenant appointed under Title 10, U.S.C., 2106 or 2107, in May or June and ordered to EAD in either of those months, the CGDOR is the date cadets graduate from the Air Force Academy that particular year.

7.8.1. For appointees entering EAD 1 July or later, compute according to paragraph 7.5.1.2.

7.9. For a Reserve or ANG officer entering EAD under Title 32, U.S.C., 708 or Title 10, U.S.C., 10301, 10211, 12301, 12310, or 12402, the CGDOR equals the DOR.

7.10. For an officer transferring from another branch of service (EAD to EAD) according to AFI 36-2004, *Interservice Transfer of Officers on the Active Duty List to the United States Air Force (USAF),* the CGDOR equals the date of rank (DOR) held in the losing service and is announced in the EAD order.

**8. Determining DOR of Airmen on Enlistment or Reenlistment in the Regular Air Force (RegAF).** HQ AFPC/DPPPWM/DPPAEQ and MPF/Career Enhancement determine DOR on enlistment or reenlistment.

8.1. Airmen in the following categories receive a DOR equal to the date of enlistment in the RegAF: Nonprior service enlistees (members who have served less than 24 months total active federal military service); former members of a regular component enlisting on or after their 6th anniversary of their DOS; reservist who enlisted in a pay grade higher than last grade held in a regular component; reservist who have never served in a regular component. Reserve enlistees must meet the TAFMS criteria for grade.

8.2. For prior service RegAF members enlisting in the same grade and in an Air Force Specialty (AFS) at the 3-skill level or higher for a Directed Duty Assignment (DDA) or for retraining into a designated AFS, compute the DOR on the basis of: adjust the DOR by the number of days break in active duty if break is less then four years; one-half of the member's previous time in grade (TIG), when the enlistment date is on or after the fourth anniversary and before the sixth anniversary of the DOS; DOR equals date of enlistment when the adjusted DOS is on or after the sixth anniversary of the DOS. If member was serving in a regular component other than RegAF and enlists in a lower grade due to TAFMSD, DOR will be computed from the original DOR for the enlistment grade and years separated from DOS as indicated above. If member received a promotion(s) in a Reserve component and enlists in lower grade due to TAFMS and the enlistment grade was previously held in a regular component, DOR will be computed from the original DOR for the enlistment grade and years separated from DOS as indicated above. If enlistment grade was not held in a regular component, DOR will be equal to date of enlistment.

**Figure 1. Example of DOR Computation.**

| | |
|---|---|
| Date RegAF enlistment | 00-03-20 |
| Subtract DOS + 1 (Block 12b on DD Form 214) | 95-01-12 |
| Break in service between regular components | 05-02-08 |

| | |
|---|---|
| DOS + 1 (Block 12b on DD Form 214)<br>Subtract DOR (Block 12h on DD Form 214)<br>TIG at time of discharge from regular component | 95-01-12<br>93-09-19<br>1-03-23 |
| TIG at time of discharge from regular component<br>TIG credit as indicated above (multiply by ".5" for half credit and "1" for full credit<br>Computed TIG for new DOR | 1-03-23<br>x .5<br>0-07-27 |

***NOTE:*** Months are computed as 30 days. Fractions in day column are rounded up to next whole number.

8.3. Reserve members serving on EAD with the RegAF who are discharged from an ARC for immediate reenlistment in the RegAF, adjust DOR as above and credit time served on current EAD, provided they meet the TAFMS criteria for the grade in which they are serving.

8.4. Former Air Force commissioned officers with reenlistment rights under Title 10, U.S.C., 8258, receive the same DOR they held on discharge from enlisted status to serve on EAD as a commissioned officer, provided they reenlist within 6 months after release from commissioned officer status.

8.5. For former members of any other regular components of the armed forces, compute the DOR as indicated in paragraph **8.4.** provided their skill is on the PSRSL and they are eligible to enlist through the Prior Service program.

8.6. Reserve members serving on EAD with the RegAF who are discharged from an ARC for immediate reenlistment in the RegAF keep the same DOR they held on discharge, provided they meet the TAFMS criteria for the grade in which they are serving.

8.7. Former Air Force commissioned officers with reenlistment rights under Title 10, U.S.C., 8258, receive the same DOR they held on discharge from enlisted status to serve on EAD as a commissioned officer, provided they reenlist within 6 months after release from commissioned officer status.

**9. Determining DOR of Reserve Airmen Ordered to or Released From EAD.** HQ AFPC/DPPAOR/DPPPWM/DPPAES and MPF/Career Enhancement determine DOR for Reserve airmen ordered to or released from EAD**.**

9.1. Airmen Entering EAD. For airmen involuntarily ordered to EAD or entering EAD under Title 10, U.S.C., 12310, their AD DOR is the same as their Reserve DOR. However, if they were voluntarily ordered to EAD, compute their AD DOR by backdating the date they entered EAD by a period equal to: the Air Force service credit they received under **Table 3.**, column B, in the grade in which they entered EAD (or in a higher grade), or the credit they received for each retirement point earned in the Air Force in their current or higher Reserve grade of inactive duty training. (Membership points are not creditable.)

9.1.1. Do not credit service that airmen performed before a break in service of more than 90 days, for Regular or Reserve members, or more than 6 months for former commissioned or warrant officers entitled to reenlist under Title 10, U.S.C., Section 8258; or followed with service in a

grade lower than the one in which they entered EAD. ***NOTE:*** For Reserve airmen voluntarily ordered to EAD, the MPF servicing the AD unit to which they are reporting asks HQ AFPC/DPPAOR to determine the DOR.

9.2. Other Airmen Ordered to EAD.

9.2.1. Former AFROTC cadets ordered to EAD under Title 10, U.S.C., 2105 and 2107, keep the DOR specified on their Reserve enlistment contract.

9.2.2. Former Air Force Academy cadets transferred to the Air Force Reserve and ordered to EAD under Title 10, U.S.C., 9348, keep the DOR established on disenrollment. The disenrollment order records the DOR.

9.2.3. Reserve airmen voluntarily ordered to EAD under Title 10, U.S.C., 12301, by HQ AFPC/DPPAES keep the DOR that their unit established before EAD.

9.3. Reserve airmen voluntarily released from EAD in the same grade in which they entered such duty keep the DOR they held before entering EAD. If they are released from EAD in a different grade, they keep their AD DOR.

**10. Determining DOR of Retired Airmen Ordered to EAD.** HQ AFPC/DPPAOR establishes the DOR of retired airmen ordered to EAD by adding the period between the date they retired and the date they returned to AD to the DOR they held when they retired.

**11. Determining DOR of Promoted Airmen.** HQ AFPC/DPPPW, HQ AFRC/DPA, and MPF/Career Enhancement determine the DOR of promoted airmen. The DOR of airmen promoted to a grade above airman basic is the same as the effective date of the promotion, except when paragraphs **11.1.** through **11.6.** apply.

11.1. When the commander withholds a promotion on the basis of AFI 36-2502, *Promotion of Airman*, the airman's DOR is the date the airman would have been promoted originally. The effective date is the date the commander ends the withhold action.

11.2. When the commander defers a promotion on the basis of AFI 36-2502, the airman's DOR and effective date are the 1st day of the month following the month in which the deferral ended. If the commander ends deferral action on the 1st day of the month, the DOR and effective date are that date.

11.3. The DOR of an airman selected for promotion but by mischance not promoted on the established promotion date is the DOR the member would have received had the promotion occurred on time.

11.4. The DOR of a regular airman selected in one cycle but not promoted until the next cycle because of lack of grade vacancies is the date the member would have received had the promotion occurred on the last day of the first cycle.

11.5. When a USAFR airman is demoted under AFI 36-2503, *Administrative Demotion of Airmen,* paragraph 17.2, and is subsequently promoted, adjust the DOR to credit previous service in the same grade or a higher grade.

11.6. Once a USAFR airman's promotion is approved, the DOR is the 1st day of the promotion month after the member first meets eligibility requirements. This applies to both unit members and individual mobilization augmentees (IMA).

**12. Determining DOR of Demoted Airmen.** HQ AFPC/DPPPWM and MPF/Career Enhancement determine DOR of demoted airmen**.**

12.1. The DOR in the grade to which an airman is reduced under AFI 36-2503, paragraphs 3.2 through 3.4, is the same as the effective date of the demotion action.

12.1.1. If the airman is eligible to apply for retirement in lieu of demotion but does not elect to retire, the effective date and DOR are the 4th workday after the airman acknowledges receipt of demotion approval notification.

12.1.2. If the airman is demoted under AFI 36-2503, paragraph 3.1, the DOR is the date on which the airman first performed service in the reduced grade.

12.1.3. HQ USAF/DPFPP determines the DOR of an airman demoted under AFI 36-2503, paragraphs 3.5 or 3.6.

12.2. The DOR in the grade to which an airman is reduced under Article 15, *Uniformed Code of Military Justice (UCMJ),* is the date of the endorsement (or letter) directing the reduction.

12.2.1. If a reduction is "set aside," the DOR and effective date revert to the original DOR and effective date the airman held before reduction.

12.2.2. If the airman is demoted under AFI 36-2503, paragraph 3.1, the DOR is the date on which the airman first performed service in the reduced grade.

12.2.3. If a reduction is later suspended, the DOR reverts to the one held before the reduction. Effective date is the date of the letter directing the suspension.

12.2.4. If a reduction is suspended but the suspension is later vacated, the DOR in the grade to which the airman is reduced is the date of the original reduction endorsement or letter. The effective date, however, is the date of the vacation action.

12.2.5. When the punishment is mitigated to the extent that the former grade is restored, the DOR and effective date are the date of the mitigation action.

12.3. If a grade reduction occurs because of a court-martial sentence, the airman's DOR and effective date are the date the convening authority approves the court-martial sentence, unless the court-martial order specifies another date of "action" by the convening authority.

12.4. The DOR of a USAFR airman demoted under AFI 36-2503, paragraph 17.1, is the date of the demotion order. Prepare orders as soon as you receive the endorsement or letter directing the reduction.

12.4.1. For a USAFR airman reduced under AFI 36-2503, paragraph 17.2, the DOR is the former DOR of the grade to which the airman is reduced.

12.4.2. For a USAFR airman reduced under AFI 36-2503, paragraph 17.2, to a grade not previously held, the DOR for the reduced grade is the date on which the airman first performs active service in the lowest grade held.

12.4.3. For a USAFR airman reduced under AFI 36-2503, paragraphs 17.6.3, 17.6.4, and 17.6.5, the DOR is the former DOR of the grade to which the airman is reduced. If the USAFR airman is reduced to a grade not previously held, the DOR for the reduced grade is the date on which the airman first performs active service in the lowest grade held. For both, the effective date is the day prior to the Effective Date Change Strength Accountability (EDCSA) of reassignment.

**13. Determining DOR for Airmen Retrained or Reassigned from Band Duties.** HQ USAF/DPFPP determines the DOR when a member of the USAF or Air Force Space Command Band either retrains or is reassigned from the band Air Force Specialty Code.

**14. Adjusting Airman's DOR To Deduct Lost Time.** When adjusting an airman's service dates to deduct lost time (paragraph **4.5.**), also adjust the DOR to deduct the lost time. When computing DOR, compute the actual number of days lost in that grade on a day-for-day basis.

**15. Form Prescribed.** AF Form 1613, **Statement of Service.**

**Table 1. Explanation of Service Dates.**

| RULE | A | B | C |
|---|---|---|---|
| | **If service date to be computed is** | **and individual is** | **then this date includes** |
| **1** | total active Federal military service date (TAFMSD) | enlisted, officer, or warrant officer | all periods of active Federal military service in commissioned, warrant, flight officer, or enlisted status. When there is no break in AD from date of original entry on such duty, TAFMSD is the date of original entry on AD. When there is a break in AD, TAFMSD is later than the date of original entry on AD by a period equal to the break or breaks. Does not include AD while a student at Uniformed Services University of Health Sciences (USUHS) or Health Professions Scholarship Program (HPSP). Includes concurrent enlisted cadet status and solely cadet status at a service academy for airmen only. |
| **2** | total active Federal commissioned service date (TAFCSD) | an officer | all periods of AD Federal commissioned service. When there is no break in AD commissioned service from original date of entry on AD in such status, TAFCSD is the date of original entry on AD in commissioned status. When there is a break, TAFCSD is later than the date of original entry on AD in commissioned status by a period equal to the break or breaks. Does not include AD while a student at USUHS or HPSP. |
| **3** | total Federal commissioned service date (TFCSD) | an officer | all periods of Federally recognized commissioned service, whether active or nonactive duty. When there is no break in commissioned service from date of acceptance of original commission or from date of original Federal recognition, TFCSD is the date of acceptance of original commission or the date of Federal recognition, as appropriate. When there is a break, TFCSD is later than the date of acceptance of original commission or the date of original Federal recognition by a period equal to the break or breaks. |

| RULE | A | B | C |
|---|---|---|---|
| | If service date to be computed is | and individual is | then this date includes |
| 4 | total years service date (TYSD) | a Reserve officer | all service as a commissioned officer of any uniformed service; all service before 15 June 1933 as a commissioned officer in the Federally recognized National Guard (NG) or in a Federally recognized commissioned status in the NG; all service in the NG after 14 June l933 when such service was continuous from the date of Federal recognition as an NG officer to the date of appointment in the NG; and all service credited under Title 10, U.S.C., 12207. (Service in the Women's Army Auxiliary Corps is not creditable.) (See notes 1 and 2.) |
| 5 | date of rank (DOR) | a Reserve officer | all creditable promotion service in current Reserve grade. (See note 3.) |
| 6 | current grade date of rank (CGDOR) | a Regular or Reserve officer | entry grade credit exceeding that needed for the AD or creditable service in grade in which ordered to EAD. |
| 7 | total enlisted military service date (TEMSD) | enlisted | all periods of active and inactive enlisted service creditable for basic pay. (Usually, TEMSD is the same date as pay date.) (See note 4.) |
| 8 | pay date | enlisted or officer | service computed according to the DoDFMR 7000.14-R. |
| 9 | EAD (see Note 5) | enlisted | time from the date the member entered on current tour of AD (Regular or Reserve), backdated by the amount of time served on AD (commissioned or enlisted) without a break in AD. For example, a member graduating from Officer Training School (OTS) is assigned an EAD date equal to the date of acceptance as a commissioned officer. Later, the member involuntarily separates and immediately enlists in the RegAF. In this case, backdate the EAD date to the date of enlistment for OTS. |
| 10 | | a Regular officer or warrant officer | service from the date of acceptance of commission or appointment in the RegAF. |

| R U L E | A | B | C |
|---|---|---|---|
| | **If service date to be computed is** | **and individual is** | **then this date includes** |
| 11 | | a Reserve officer | service from the date the member entered on current tour of EAD. (Do not change this date for officers who are appointed in the AF while serving on EAD in the USAF, or for noncareer officers with an established date of separation who accept Career Reserve status while serving under a specified period of time contract [SPTC]). However, the EAD date of a Reserve officer who transfers to the Air Force while on EAD with another service is the date the officer is ordered to EAD with the Air Force. When an officer enters EAD while serving on a specified short tour of AD for training, the EAD date is the date the officer enters EAD. |
| 12 | 1405 service date (service for retirement pay multiplier) | enlisted or officer with "18-plus years active military service" | all service creditable under Title 10, U.S.C., 1405, computed according to AFI 36-3203, *Service Retirement*. Include service for basic pay before 1 June 1958; all active duty after 31 May 1958; 1 day for each inactive duty point earned while not on AD limited to 75 points, including membership points in any 1 retirement year. |
| 13 | date initial entry uniformed service (DIEUS) | enlisted, officer, or warrant officer | service from the date of initial acceptance of commission, appointment, or enlistment in any branch of the Armed Forces (Regular or Reserve; active or inactive). This is a fixed date and is not adjusted for time lost or breaks in service. It includes enlistment as a Reserve in the Senior ROTC program, or as a scholarship cadet or midshipman under Title 10, U.S.C., 2107 or 2107(a), enlistment under Title 10, U.S.C., 12103, enlistment in the active component delayed entry/enlistment program (DEP), and entrance as a cadet or midshipman at a service academy. |

| RULE | A | B | C |
|---|---|---|---|
| | **If service date to be computed is** | **and individual is** | **then this date includes** |
| **14** | date initial entry Reserve Forces (DIERF) | enlisted, officer, or warrant officer in USAFR or<br>ANG | service from the date of initial acceptance of commission, appointment, or enlistment in any Reserve component of the Armed Forces. This is a fixed date and is not adjusted for time lost or breaks in service. Enlistment or commissioning not for initial affiliation with a participating Reserve program, the DIERF will be the subsequent date that the individual reaffiliates with the Reserve component. This date does include time in the active component, DEP, ROTC, or professional appointment program (see note 6). This date cannot be later than pay date. |
| **15** | current grade effective date/permanent grade effective date | enlisted or officer | the date an individual is entitled to the pay and authority of the grade (see note 7 for officer). |

***NOTES:***

1. DOR is used to determine a commissioned officer's eligibility for a Reserve promotion. TFCSD determines active Reserve status based on maximum service under Title 10, U.S.C., 14507 or 14508(a) and (b) for officers appointed on or after 1 July 1955.
2. Limit service credit to 21 years for lieutenant colonels and to 23 years for colonels.
3. Use DOR to determine the eligibility for Reserve Officer Personnel Management Act (ROPMA) promotion for a Reserve officer not on the ADL. When promoted, award a DOR according to AFI 36-2504, Reserve of The Air Force Officer Promotions. Do not award DOR credit for periods of service not in an active status. HQ ARPC, Promotions Branch (DPJA) is the OPR for Reserve officers not on the ADL. ANGRC/DPMO is the OPR for ANG officers not on the ADL.
4. TEMSD applies only to master and senior master sergeants.
5. AD pay begins the date a Reserve member begins travel in compliance with an EAD order. DoD-FMR 7000.14-R, paragraphs 10241 through 10242, and AFI 36-2608, *Military Personnel Records Systems*, Chapter 3, explain how to compute allowable travel time. Use the travel voucher in conjunction with the EAD order when computing allowable travel time. If computation of EAD date results in a date different from the one shown in the order, amend the order according to AFI 37-128, *Administrative Orders*.
6. If an ROTC graduate chooses to participate in the Selected Reserve instead of normal active duty, the DIERF is the date of commissioning, if there is no earlier qualifying date.
7. These dates are never less than TFCSD. If the airman receives constructive credit under AFI 36-2005, *Appointment in Commissioned Grades and Designation and Assignment in Professional Categories - Reserve of the Air Force and United States Air Force*, do not reflect it in either date.

**Table 2. Required Service Dates For Officers, Warrant Officers, And Airmen.**

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RULE | If member is | and he or she is on EAD | then the required service date is | | | | | | | | | | | |
| | | | TAFMSD | TAFCSD | TFCSD | TYSD | DOR | TEMSD (see note 2) | PAY DATE | EAD DATE | CGDOR | 1405 Svc date (see note 3) | DIEUS | DIERF |
| 1 | an airman | yes | X | | | | | X | X | X | | X | X | |
| 2 | | no | (see note 1) | | | | | X | X | | | | X | X |
| 3 | a Reserve commissioned officer | yes | X | X | X | X | (see note 4) | | X | X | X | X | X | |
| 4 | | no | (see note 1) | (see note 1) | X | X | X | | X | | | | X | X |
| 5 | a Regular commissioned officer | yes | X | X | X | | | | X | X | X | X | X | |
| 6 | a warrant officer | no | (see note 1) | | | | | | X | | X | | X | X |

***NOTES:***

1. If a Reserve member is not on EAD, compute the TAFMSD and TAFCSD in years, months, days from AF Form 526, ANG/USAFR Point Credit Summary (AFMAN 36-8001).
2. Pertains only to enlisted personnel in grades master sergeant and senior master sergeant.

3. The 1405 service date (retirement pay multiplier) for officers and enlisted on attaining 18 years of active military service.
4. When on EAD, DOR equals permanent grade DOR unless one of the following applies: either the officer's permanent grade is higher than the current grade, or the permanent grade DOR is earlier than the CGDOR when the permanent and current grade are equal.

**Table 3. Creditable Service For Total Active Federal Military Service Date (TAFMSD), Total Active Federal Commissioned Service Date (TAFCSD), Total Federal Commissioned Service Date (TFCSD), Total Years Service Date (TYSD), Total Enlisted Military Service Date (TEMSD), Pay Date, And 1405 Service Date.**

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **LINE** | **Creditable Service** | **TAFMSD (see notes 1, 5, and 13)** | **TAFCSD (see notes 2, 5, and 13)** | **TFCSD (see notes 3 and 5)** | **TYSD (see notes 3 and 5)** | **TEMSD (see note 4)** | **Pay Date (see note 5)** | **1405 Svc Date (see notes 6, 7 and 8)** |
| **1** | Service in a Regular component of US Armed Forces | X | X | X | X | X | X | X |
| **2** | Service in a Reserve component of US Armed Forces (see notes 9 and 10) | X | X | X | X | X | X | X |
| **3** | NG | X | X | X | X | X | X | X |
| **4** | Army or Air Force of the United States (without specification of any component) | X | X | X | X | X | X | X |
| **5** | Public Health Service | X | X | X | X | | X (see note 11) | X (see note 11) |
| **6** | Reserve Corps of the Public Health Service | | | X | X | | X (see note 11) | X (see note 11) |
| **7** | Nurse Corps of the Public Health Service | X | X | X | X | | X | X |
| **8** | Nurse Corps Reserve of the Public Health Service | | | X | X | | X | X |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **LINE** | **Creditable Service** | **TAFMSD (see notes 1, 5, and 13)** | **TAFCSD (see notes 2, 5, and 13)** | **TFCSD (see notes 3 and 5)** | **TYSD (see notes 3 and 5)** | **TEMSD (see note 4)** | **Pay Date (see note 5)** | **1405 Svc Date (see notes 6, 7 and 8)** |
| **9** | National Oceanic and Atmospheric Administration | X | X | X | X | | X (see note 11) | X (see note 11) |
| **10** | Constructive service credit awarded a Reserve officer appointed on or after 1 July 1955 | | | | X | | | |
| **11** | Constructive service credit awarded an MC or DC Officer | | | | X | | X (see note 11) | X (see note 11) |
| **12** | Any period on and after 12 December 1941 when an enlisted member of the armed forces stays in service beyond ETS for medical treatment or hospitalization for disease or injury incident to service and not due to misconduct | X | | | | X | X | X |
| **13** | Service as a cadet or midshipman is creditable for enlisted member (see note 12) | X | | | | | X | X |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| LINE | Creditable Service | TAFMSD (see notes 1, 5, and 13) | TAFCSD (see notes 2, 5, and 13) | TFCSD (see notes 3 and 5) | TYSD (see notes 3 and 5) | TEMSD (see note 4) | Pay Date (see note 5) | 1405 Svc Date (see notes 6, 7 and 8) |
| 14 | You may count service performed under a fraudulent enlistment that the Government has not voided. Do not count such service if the Government determines it to be fraudulent and voids it for that reason. | X | | | | X | X | X |
| 15 | Uniformed Service University of Health Sciences | | | X | | | (see note 11) | (see note 11) |
| 16 | Service before 16 Apr 1947 while holding an appointment as nurse, Reserve nurse, physical therapist, dietitian, or commissioned officer in the Army Nurse Corps, the Navy Nurse Corps, or Reserve components thereof as they existed before 16 Apr 1947 | X | X | X | X | | X | X |
| 17 | You may count service as an enrolled member in the Women's Auxiliary Corps during the period 14 May 1942 through 29 Sep 1943 if the member performed active military service after 29 Sep 1943 | X | | | | X | X | |

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **LINE** | **Creditable Service** | **TAFMSD (see notes 1, 5, and 13)** | **TAFCSD (see notes 2, 5, and 13)** | **TFCSD (see notes 3 and 5)** | **TYSD (see notes 3 and 5)** | **TEMSD (see note 4)** | **Pay Date (see note 5)** | **1405 Svc Date (see notes 6, 7 and 8)** |
| **18** | Constructive service credit for NC, BSC, and MSC authorized by Title 10, U.S.C., 12207, effective 4 December 1987 | | | | X | | | |

***NOTES:***

1. Credit AD, including ADT for active Reserve and National Guard personnel, as a commissioned officer, commissioned warrant officer, Army field clerk, and enlisted member of the uniformed services (service under Title 32, U.S.C., 503, 504, and 505).
2. Credit AD, including ADT as a commissioned officer and commissioned warrant officer of the uniformed services (service under Title 32, U.S.C., 503, 504, and 505).
3. Credit active and nonactive duty as a commissioned officer and commissioned warrant officer. This includes any period for which a member of the armed forces is on one of the following: the Regular retired list as a commissioned officer or commissioned warrant officer; a non-Regular retired list (such as USAF retired), if the member concurrently holds a valid commission, or a TDRL. Do not count any period more than once.
4. Credit only enlisted service. This date only applies to master sergeants and senior master sergeants. See AFI 36-2502 for further information.
5. Do not credit active duty while in the HPSP or the USUHS as active military or active commissioned service. Credit service while in the HPSP or USUHS for TFCSD and TYSD. For Regular or Reserve members who have been reappointed to MSC, BSC, or NC or who graduated from the HPSP or USUHS, reduce credited service by the amount of time in the HPSP or USUHS program.
6. For USUHS participants whose enrollment is terminated before graduation, the service at USUHS is creditable in determining years of service for retired pay multiplier under Title 10, U.S.C., Section 1405.
7. Do not credit time spent in ISLRS, or any other inactive Reserve service after 31 May 1958. Creditable service includes: all service for basic pay before 1 June l958; all active duty after 31 May 1958; one day for each inactive duty point earned while not on active duty, limited to 60 points (including membership points) in any 1 retirement year. Effective 23 September 1996, the fiscal 1997 National Defense Authorization Act increased the maximum inactive duty points creditable toward retirement from 60 to 75 in any one year of service (including membership points). Any

retention/retirement date year ending on or after 23 Sep 1996 and all future years of service can earn up to 75 inactive duty points in any one retirement year.

8. **Table 1.**, rule 12, defines creditable service. It is not retroactive or grandfathered.
9. For officers, do not credit service that they performed while members of advanced ROTC after 12 October 1964 for any purpose except military service obligation, unless a member of the Simultaneous Membership Program (SMP) after 1 August 1979. Title 10, U.S.C., 2106 and 2107.
10. For anyone entering the DEP after 31 December 1984, do not credit DEP service for basic pay purposes. For persons who were discharged from the DEP for reasons other than entry to AD and who later entered AD after 31 December 1984, do not credit the previous DEP service unless their discharge was for convenience of the government. For persons who entered the DEP before 1 January 1985 and entered active duty before 1 January 1985, credit all DEP service. For persons who entered DEP before 1 January 1985 and who subsequently entered AD directly from DEP after 31 December 1984, credit all DEP service.
11. Include the constructive service credit in computing the pay date and 1405 service authorized under Title 37, U.S.C., 205a(7) and (8) as repealed by Public Law 96-513, 94 Stat. 2835, DOPMA for persons who on 14 September 1981: were medical or dental officers in the armed forces, or participating in a program leading to an MC or DC appointment and were subsequently reappointed as an MC or DC officer or who held an MC or DC commission in the Public Health Service (PHS). UHUHS credit is for Post-DOPMA students only. **The maximum constructive service credit is 4 years for MC or DC officers and 1 additional year for medical officers who completed a medical internship or equivalent or entered military status while serving such internship. Credit PHS for pay provided it does not duplicate a period of professional training awarded under computation of constructive credit under Title 37, U.S.C., 205(7) and (8). To receive this service credit, an officer in one of the above categories must have taken the oath of office on 14 September 1981 or earlier. Members entitled to this constructive credit on 14 September 1981 who are subsequently discharged and later reappointed an MC or DC officer remain eligible for this constructive service credit regardless of the break in service.**
12. Credit service as a cadet or midshipman at a military service academy only for enlisted personnel. Do not credit such service for officers. However, if a commissioned officer who attended a military service academy reverts to an enlisted status, then you may credit the time served at an academy. Credit the time served at a military service academy preparatory school in an enlisted status for both enlisted and officer personnel.
13. Air Force Reserve components do not use specific dates for the TAFMSD and TAFCSD; instead, they work with an amount of time (years, months, and days).

**Table 4. Creditable Service For Date Of Rank (DOR) Of Reserve Commissioned Officers (see notes 1and 5).**

| | | RULE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **If officer was** | | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** |
| **A** | appointed in Air Force to current grade before 1 July 1955 | Yes | | | | | | | | |
| **B** | appointed in Air Force to current grade after 30 June 1955 | | Yes | | | | | | | |
| **C** | appointed in Air Force to current grade after 30 September 1996 (see note 5) | | | Yes | | | | | | |
| **D** | appointed in May or June of any year as 2d Lt under Title 10, U.S.C., 2106(b) or 2107(e) before 30 July 1976 | | | | Yes | | | | | |
| **E** | promoted under Title 10, U.S.C., 8376 (AFI 36-2504) | | | | | Yes | | | | |
| **F** | promoted under a provision other than Title 10, U.S.C., 8376 | | | | | | Yes | | | |
| **G** | transferred to Air Force under Title 10, U.S.C., 716, while on active duty | | | | | | | Yes | | |
| **H** | transferred to Air Force under Title 10, U.S.C., 716, before 25 April 1961 while not on AD | | | | | | | | Yes | |
| **I** | transferred to Air Force under Title 10, U.S.C., 716, after 24 April 1961 while not on AD | | | | | | | | | Yes |
| **then count (see notes 1 and 4)** | | | | | | | | | | |
| **J** | service from date of acceptance or from effective date of Federal recognition | X (see note 2) | X | X | | | | X | X | X |
| **K** | constructive service awarded under AFI 36-2005 exceeding the amount required for the grade in which appointed | | X | X | | | | | | |

| | | RULE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **If officer was** | | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** |
| **L** | service from date cadets graduate from the Air Force Academy for that year | | | | X | | | | | |
| **M** | service from date of application under AFI 36-2504 | | | | | X | | | | |
| **N** | service from effective date of promotion or effective date of Federal recognition | | | | | | X | | | |
| **O** | service after 25 June 1950 and before 1 July 1955 in an equal or higher Reserve or Regular grade in any Armed Forces component (see note 3) | X | X | | | X | X | | X | |
| **P** | service after 25 June 1950 and before 1 July 1955 from the date member became eligible for a Reserve promotion as a result of serving in a higher temporary grade and completing minimum service in lower grade (see note 3) | X | X | | | X | X | | | |
| **Q** | all promotion service in Army, Navy, or Marine Corps at time of transfer | | | | | | | X | | X |
| **R** | all constructive service credited an MC or DC officer (see note 3) | X | X | X | | X | | | | |

***NOTES:***

1. Adjust an officer's DOR to deduct credit if the officer is removed from active status as defined in AFI 36-2504 or if the officer is deferred from promotion. When a first lieutenant returns to active status, do not credit the officer with more than 3 years of promotion service; do not credit captains and majors with more than 6 years promotion service. (Do credit time on the TDRL.)

2. Include service under a 5-year term appointment that terminated on acceptance of an indefinite term appointment; in the Air Force Reserve for an ANG officer whose USAFR appointment terminated on acceptance of the ANG appointment; in the ANG for a USAFR officer whose ANG appointment terminated on acceptance of the USAFR appointment; or from the date the officer

accepted an Army appointment or promotion to the current grade, if the officer has served continuously in the Army and the Air Force in that grade and transferred to the Air Force before 26 July 1950.

3. Do not count service twice. If you credit a certain period of service under one rule, do not credit it again under another rule.
4. Do not credit an officer whose DOR takes effect on appointment or reappointment according to AFI 36-2005, paragraph 2.17, and makes the officer eligible for promotion or promotion consideration within 12 months of the date the officer accepted the appointment. This restriction gives the officer enough time to earn at least one OPR before promotion consideration under AFI 36-2504.
5. Adjust an officer's DOR to deduct credit if the officer is removed from active status as defined in AFI 36-2504. (Do credit time on the TDRL).

**Table 5. Minimum Entry Grade Credit for Medical And Dental Corps Officers.**

| R U L E | A | B | C | D | E |
|---|---|---|---|---|---|
| | **If ordered to EAD in AD grade of** | **then the minimum entry grade credit (in years) is** | | | |
| | | FY 1981 | FY 1982 | FY 1983 | FY 1984 and beyond |
| **1** | captain | 4 | 4 | 4 | 4 |
| **2** | major | 9 ½ | 10 | 10 | 10 |
| **3** | lieutenant colonel | 14 ½ | 15 | 15 ½ | 16 |
| **4** | colonel | 21 | 21 1/2 | 22 | 22 |

**Table 6. Minimum Entry Grade Credit For Biomedical Sciences Corps (BSC), Medical Service Corps (MSC), Nurse Corps (NC), Chaplains And Judge Advocate General Department Officers.**

| R U L E | A | B |
|---|---|---|
| | **If ordered to EAD in the grade of** | **then the minimum entry grade credit (in months) is** |
| **1** | second lieutenant | none |
| **2** | first lieutenant | 24 |
| **3** | captain | 48 |
| **4** | major | (see note) |

***NOTE:*** The minimum entry grade credit varies according to Air Force needs for each fiscal year and is determined when an officer is ordered to EAD in the grade of major. See AFI 36-2008, table 1, rule 9.

ROGER A. BRADY, Lt General, USAF
DCS/Personnel

## Attachment 1

## GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION

***References***

Title 10, United States Code, *Armed Forces,* Sections 972, 1405, 2105, 2106, 2107, 8013, 8258, 9348,10211, 10301, 12103, 12207, 12301, 12310, 12402, 12733, 14507, 14508(a) and (b)

Title 32, United States Code, *National Guard,* Sections 503, 504, 505, 708

Title 37, United States Code, *Pay and Allowances of the Uniformed Services,* Section 205

Executive Order 9397, *Numbering System for Federal Accounts Relating to Individual Persons,* 11 November 1943

Department of Defense Directive (DoDD) 1310.1, *Rank and Seniority of Commissioned Officers,* 29 Apri1 1996

Department of Defense Financial Management Regulation, Volume 7A, *Military Pay Policy and Procedures Active Duty and Reserve Pay,* DOD 7000.14-R, 22 July 1996

AFPD 36-26, *Military Force Management*, 20 December 1993

AFI 33-360,VI, *Publications Management Program,* 1 January 1998

AFI 36-2004, *Interservice Transfer of Officers on the Active Duty List to the United States Air Force (USAF),* 10 June 1994

AFI 36-2005, *Appointment in Commissioned Grades and Designation and Assignment in Professional Categories - Reserve of the Air Force and United States Air Force,* 1 May 1998

AFI 36-2008, *Voluntary Extended Active Duty (EAD) for Air Reserve Commissioned Officer,* 19 August 1994

AFI 36-2009, *Delay in Active Duty for AFROTC Graduates,* 20 July 1994

AFI 36-2502, *Airman Promotion Program,* 20 July 1994

AFI 36-2503, *Administrative Demotion of Airmen,* 20 July 1994

AFI 36-2504, *Officer Promotion, Continuation and Selective Early Removal in the Reserve of the Air Force,* 1 March 1997

AFI 36-2608*, Military Personnel Records System,* 1 July 1996

AFI 36-3203*, Service Retirements,* 20 July 1994

AFMAN 36-8001, *Participation and Training Procedures,* 1 March 1996

AFI 37-128*, Administrative Orders (PA),* 1 October 1994

***Abbreviations and Acronyms***

**AD**—Active Duty

**ADL**—Active Duty List

**ADT**—Active Duty for Training

**AFIT**—Armed Forces Institute of Technology

**AFSC**—Air Force Specialty Code

**ANG**—Air National Guard

**ARPC**—Air Reserve Personnel Center

**BSC**—Biomedical Sciences Corps

**BSN**—Bachelor of Science Degree in Nursing

**CGDOR**—Current Grade Date of Rank

**DC**—Dental Corps

**DDA**—Directed Duty Assignment

**DEP**—Delayed Enlistment Program

**DFAS**—Defense Finance and Accounting Service

**DIERF**—Date Initial Entry Reserve Forces

**DIEUS**—Date Initial Entry Uniformed Service

**DoDFMR**—Department of Defense Financial Management Regulation, 7000.14-R

**DOPMA**—Defense Officer Personnel Management Act

**DOR**—Date of Rank

**DOS**—Date of Separation

**DRP**—Delayed Reenlistment Program

**EAD**—Extended Active Duty

**EDCSA**—Effective Date Change Strength Accountability

**EPR**—Enlisted Performance Report

**ETS**—Expiration Term of Service

**HPSP**—Health Professions Scholarship Program

**IMA**—Individual Mobilization Augmentee

**ISLRS**—Inactive Status List Reserve Section

**JA**—Judge Advocate

**MC**—Medical Corps

**MPF**—Military Personnel Flight

**MPerRGp**—Master Personnel Record Group

**MSC**—Medical Service Corps

**NC**—Nurse Corps

**NG**—National Guard

**NOAA**—National Oceanic and Atmospheric Administration

**OPR**—Office of Primary Responsibility

**OTS**—Officer Training School

**PDS**—Personnel Data System

**PED**—Promotion Eligibility Date

**PHS**—Public Health Service

**PLSD**—Promotion List Service Date

**RASL**—Reserve Active Status List

**RegAF**—Regular Air Force

**ROPA**—Reserve Officer Personnel Act

**ROPMA**—Reserve Officer Personnel Management Act

**SPTC**—Specified Period of Time Contract

**TAFCS**—Total Active Federal Commissioned Service

**TAFCSD**—Total Active Federal Commissioned Service Date

**TAFMS**—Total Active Federal Military Service

**TAFMSD**—Total Active Federal Military Service Date

**TDRL**—Temporary Disability Retired List

**TEMSD**—Total Enlisted Military Service Date

**TFCSD**—Total Federal Commissioned Service Date

**TIG**—Time in Grade

**TYSD**—Total Years Service Date

**UPRG**—Unit Personnel Record Group

**USAFR**—United States Air Force Reserve

**USAFRS**—United States Air Force Recruiting Service

**USUHS**—Uniformed Service University of Health Sciences

***Terms***

**Active Duty (AD)**—Full-time duty in a Military Service of the United States. A general term applied to all active military service, including full-time National Guard duty, without regard to duration or purpose.

**Active Service**—Service on active duty or full-time National Guard duty.

**Active Status**—Status of all Reserves except those on an inactive status list or in the retired Reserve. Reservists in an active status may train for points and/or pay and may be considered for promotion.

**Armed Forces of the United States**—A term denoting all components of the Army, Navy, Air Force, Marine Corps, and Coast Guard.

**Extended Active Duty**—Duty on the Active Duty List of an armed service for a period of 90 days or more.

**Inactive Status**—Status of Reserve members on an inactive status list of a Reserve component or assigned to the Inactive Army National Guard. Those in an inactive status may not train for points or pay and may not be considered for promotion.

**Member**—A person appointed to, enlisted in, or conscripted into a uniformed service.

**Reserve Active Status List**—A list of all Reserve of the Air Force Officers in an active status, not on the Active Duty List (ADL), and in the order of seniority of the grade in which they are serving. Officers serving in the same grade shall be carried in the order of their rank in that grade.

**Reserve Components**—Reserve Components of the Armed Forces are the Army National Guard, the Army Reserve, the Naval Reserve, the Marine Corps Reserve, the Air National Guard, the Air Force Reserve, the Coast Guard Reserve, and the Public Health Service Reserve.

**Selected Reserve**—That part of the Ready Reserves which consists of units and, as designated by the Secretary concerned, individual Reservists trained as prescribed in Title 10, U.S.C., 270(a)(1)(reference [c] or Title 32, U.S.C., 502[a] reference (bq)). Most Selected Reserves are required to participate in a minimum of 48 scheduled drill or training periods annually and serve on active duty for training at least 14 days annually.

**Uniformed Services**—The Army, Navy, Air Force, Marine Corps, Coast Guard, National Oceanic and Atmospheric Administration, and Public Health Service.

**Attachment 2**

**IC 2001-1 TO AFI 36-2604, SERVICE DATES AND DATES OF RANK**

**18 DECEMBER 2001**

**SUMMARY OF REVISIONS**

This change incorporates interim change (IC) 2001-1 (**Attachment 2**). This change provides new guidance for Time In Grade (TIG) credit for prior service members. This change replaces paragraph **8.** in its entirety. Changes are not grandfathered and effective on date of publication. See the last attachment of the publication IC 2001-1 for the complete IC. A bar (/) indicates revision from the previous edition.

**8. Determining DOR of Airmen on Enlistment or Reenlistment in the Regular Air Force (RegAF).** HQ AFPC/DPPPWM/DPPAEQ and MPF/Career Enhancement determine DOR on enlistment or reenlistment.

8.1. Airmen in the following categories receive a DOR equal to the date of enlistment in the RegAF: Nonprior service enlistees (members who have served less than 24 months total active federal military service); former members of a regular component enlisting on or after their 6th anniversary of their DOS; reservist who enlisted in a pay grade higher than last grade held in a regular component; reservist who have never served in a regular component. Reserve enlistees must meet the TAFMS criteria for grade.

8.2. For prior service RegAF members enlisting in the same grade and in an Air Force Specialty (AFS) at the 3-skill level or higher for a Directed Duty Assignment (DDA) or for retraining into a designated AFS, compute the DOR on the basis of: adjust the DOR by the number of days break in active duty if break is less then four years; one-half of the member's previous time in grade (TIG), when the enlistment date is on or after the fourth anniversary and before the sixth anniversary of the DOS; DOR equals date of enlistment when the adjusted DOS is on or after the sixth anniversary of the DOS. If member was serving in a regular component other than RegAF and enlists in a lower grade due to TAFMSD, DOR will be computed from the original DOR for the enlistment grade and years separated from DOS as indicated above. If member received a promotion(s) in a Reserve component and enlists in lower grade due to TAFMS and the enlistment grade was previously held in a regular component, DOR will be computed from the original DOR for the enlistment grade and years separated from DOS as indicated above. If enlistment grade was not held in a regular component, DOR will be equal to date of enlistment.

**Figure 1. Example of DOR Computation.**

| | |
|---|---|
| Date RegAF enlistment<br>Subtract DOS + 1 (Block 12b on DD Form 214)<br>Break in service between regular components | 00-03-20<br>95-01-12<br>05-02-08 |
| DOS + 1 (Block 12b on DD Form 214)<br>Subtract DOR (Block 12h on DD Form 214)<br>TIG at time of discharge from regular component | 95-01-12<br>93-09-19<br>1-03-23 |
| TIG at time of discharge from regular component<br>TIG credit as indicated above (multiply by ".5" for half credit and "1" for full credit<br>Computed TIG for new DOR | 1-03-23<br>x .5<br>0-07-27 |

***NOTE:*** Months are computed as 30 days. Fractions in day column are rounded up to next whole number.

8.3. Reserve members serving on EAD with the RegAF who are discharged from an ARC for immediate reenlistment in the RegAF, adjust DOR as above and credit time served on current EAD, provided they meet the TAFMS criteria for the grade in which they are serving.

8.4. Former Air Force commissioned officers with reenlistment rights under Title 10, U.S.C., 8258, receive the same DOR they held on discharge from enlisted status to serve on EAD as a commissioned officer, provided they reenlist within 6 months after release from commissioned officer status.

## Attachment 3

## IC 2004-1 TO AFI 36-2604, SERVICE DATES AND DATES OF RANK

*2 DECEMBER 2004*

*SUMMARY OF REVISIONS*

This change incorporates interim change (IC) 2004-1 (**Attachment 3**). This change provides clarification for when service verification is overdue. See the last attachment of the publication, IC 2004-1, for the complete IC. A bar (|) indicates revision from the previous edition.

OPR: HQ AFPC/DPPAOR (Rose Mills)

Supersedes: AFI 36-2604, 18 December 2001

Certified by: HQ AFPC/DPP (Col Steven F. Maurmann)

3.2.2. TAFMSD, TAFCSD, TFCSD, Pay Date, TYSD (unless service component is Regular), EAD. HQ AFPC/DPPAOR prepares an AF IMT 1613**, Statement of Service**, on all officers gained to the permanent MPF within 120 days after date arrived permanent duty station and enters the computed service dates in MILPDS. HQ AFPC/DPPAOR forwards one copy of the AF IMT 1613 to the member's servicing Military Personnel Flight (MPF), for file in the member's UPRG, and forwards one copy for file in the member's master personnel record group (MPerRGp).

3.4.2.1. Prior Service Airmen who enlist after a break in service. HQ AFPC/DPPAOR completes AF IMT 1613 within 120 days after date arrived permanent duty station.

## Attachment 8

## RETIRED PAY EXAMPLES AND EXPLANATORY REMARKS

**A8.1.** Using proper service dates and personnel data, a prospective voluntary retiree should be able to estimate retired pay based on several options now available and select a retirement date offering the most advantageous option.

A8.1.1. For officers, significant dates are:

-- Total Active Federal Military Service Date (TAFMSD).

-- Total Active Federal Commissioned Service Date (TAFCSD).

-- Pay date (total military service).

-- Effective date of promotion (not date of rank) or appointment to the grade in which the officer expects to retire.

-- 10 U.S.C. 1405 service.

A8.1.2. For enlisted personnel, significant dates are:

-- TAFMSD.

-- Pay date.

-- Effective date of promotion (not date of rank) to grade in which the member expects to retire.

**A8.2.** The service dates needed for estimating retired pay are in the PDS and, with the exception of 10 U.S.C. 1405 service explained below, on AF Form 1613 or (old) DD Form 13, Statement of Service, which HQ AFMPC/DPMDOO sends to the MPF for file in the unit personnel record group according to AFI 36-2604 (formerly AFR 35-3). The member should verify and agree with the dates shown or request correction.

**A8.3.** Figure the years of service for officers according to 10 U.S.C. 1405 by adding together the numbers in paragraphs A8.3.1 through A8.3.4:

A8.3.1. Years of active service.

A8.3.2. A maximum of 4 years of constructive service for education or training may be credited to officers who, on 14 September 1981, were designated as medical or dental officers, or commissioned officers of the Public Health Service, or to any person who, on 14 September 1981, was participating in a program leading to a Medical or Dental Corps appointment. Medical officers may be credited with 1 additional year for medical internship or the equivalent.

A8.3.3. Years of service not in paragraphs A8.3.1 or A8.3.2, that were creditable for basic pay before 1 June 1958. Include all inactive Reserve service or active service with the Commissioned Corps of the Public Health Service from 29 July 1945 through 3 July 1952 when the Commissioned Corps was a military service.

A8.3.4. One day's service for each point earned while not on active duty after 31 May 1958 subject to a limit of 60 points in any 1 year. Include inactive duty training points and gratuitous points. ***NOTE***: See AFI 36-8001 (formerly AFR 35-41, volume 2) for more detailed information on creditable points. Mem-

ber usually receives an annual retirement credit summary reflecting points earned while affiliated with a Reserve unit.

**A8.4.** HQ AFMPC/DPMDOO computes an officer's 1405 service date (from the officer's master personnel record) and enters it in the PDS at the officer's 18-years of active service point. If the 1405 service date appears in the Headquarters Air Force (HAF) file but not in the base-level file, entering PTI HO3 VDD 407 adds it to the base-level file.

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

DOCKET NUMBER: 00-01988 (Case 4)
INDEX CODE: 136.01, 131.00,

COUNSEL: NONE

HEARING DESIRED: NO

---

APPLICANT REQUESTS THAT:

His retirement grade of major be changed to lieutenant colonel and his retirement date of 1 Jul 95 be changed to 1 Jul 00, with recomputation of his 1405 service date to reflect he retired from active duty with 22 years and 2 months of service.

He be reimbursed for active duty pay in the grade of lieutenant colonel (Lt Col) from 1 Aug 94 to 1 Jul 00.

---

APPLICANT CONTENDS THAT:

He was nonselected for promotion to Lt Col by the CY93 and CY94 Lt Col Selection Boards. Due to his nonselections, he was forced into early retirement on 1 Jul 95. He appealed the nonselection and was subsequently promoted to Lt Col by a Special Selection Board (SSB).

In support of his request, applicant submits copies of his retirement orders, Lt Col promotion orders, orders returning him to active duty and a memo for record, with a copy of a Defense Manpower Data Center Actuary Table (Exhibit A).

---

STATEMENT OF FACTS:

The applicant has prior active duty service as an officer in the Air Force Reserve (28 Aug 72 - 1 Aug 76). He was reassigned from the Air Force Reserve Officer Reserve Section (ORS) to the Air Force Reserve Inactive Status List Reserve Section (ISLRS) on 28 Aug 78. The applicant was selected by the 18-21 Jan 82 Voluntary Reserve Officer Recall Board for return to extended active duty. On 23 Jun 82, he was ordered to active duty in the grade of captain for an indefinite period in accordance with 10 USC 672(d). The applicant was integrated into the Regular Air Force on 1 Jun 83 and progressively promoted to the grade of major, with an effective date and date of rank of 1 May 89.

On 30 Jun 95, the applicant was relieved from active duty in the grade of major under the provisions of AFI 36-3203 (Voluntary Retirement: Temporary Early Retirement Authority (TERA)) and retired, effective 1 Jul 95. At the time of retirement, he served a total of 16 years, 10 months and 18 days of active service for retirement; and, 17 years, 2 months and 6 days of service per 10 USC 1405.

On 11 Mar 99, the AFBCMR considered and recommended approval of applicant's request that the Officer Performance Report (OPR), closing 15 Apr 93 be removed from his records and replaced with a reaccomplished OPR provided; that his Promotion Recommendation Form (PRF), prepared for the CY93A Lt Col Selection Board, be removed from his records and replaced with a reaccomplished PRF provided; and, that he be considered for promotion by a Special Selection Board (SSB), with his corrected record. On 1 Jul 99, the Deputy for Air Force Review Boards directed the removal of the 15 Apr 93 OPR and the P0593A PRF from the applicant's records and replaced with the reaccomplished OPR and PRF and that he be provided promotion consideration by a SSB for the CY93 Lt Col Selection Board and any subsequent boards for which the cited OPR was a matter of record. A copy of the ROP is appended at Exhibit C.

The applicant was considered and selected for promotion to the grade of Lt Col by an SSB for the CY93A Lt Col Selection Board. By Special Order JB-000242, dated 1 Mar 00, the applicant was promoted to the grade of Lt Col, with an effective date and date of rank of 1 Aug 94.

The relevant facts pertaining to this application, extracted from the applicant’s military records, are contained in the letter prepared by the appropriate office of the Air Force. Accordingly, there is no need to recite these facts in this Record of Proceedings.

---

AIR FORCE EVALUATION:

The Directorate of Personnel Program Management, HQ AFPC/DPPRRP, stated that, a Special Selection Board (SSB) convened on 30 Aug 99 to consider the applicant for promotion to the grade of Lt Col by the CY93A (12 Oct 93) Selection Board. It was determined that had the originally scheduled board considered his corrected record, the CY93A Selection Board would have selected him for promotion to Lt Col. Subsequent to Senate confirmation, the applicant was promoted to Lt Col on 1 Mar 00, with an effective date and date of rank of 1 Aug 94. He was also advised that he could request reinstatement to active duty if he so desired.

DPPRRP stated that the applicant was informed on 7 Dec 94 that he was considered but not selected for promotion to the grade of Lt Col by the CY94 (11 Oct 94) Lt Col Selection Board. Since this

was applicant’s second nonselection for promotion, he was required by Law to be separated. However, as an exception to policy, applicant was eligible to elect to retire under the Temporary Early Retirement Authority (TERA). On 16 Feb 95, the applicant applied for retirement under TERA and his application was approved on 5 Apr 95, with an effective date of retirement of 1 Jul 95. At the time of retirement, applicant had 16 years, 10 months and 18 days of active service.

DPPRRP stated that Title 10, Section 8911, USC, states “The Secretary of the Air Force may, upon the officer’s request, retire a regular or reserve commissioned officer of the Air Force who has at least 20 years of service computed under Section 8925 of this title, at least 10 years of which have been active service as a commissioned officer.” The applicant would have reached 20 years of active service, with the 10 years of active commissioned service, on 1 Sep 98.

DPPRRP agrees that an error did occur in the applicant’s records insofar as his promotion nonselects occurred and that the Air Force should indeed try to correct his records in as equitable a manner as possible. However, DPPRRP does not agree that he should be granted excess unearned service.

DPPRRP recommended the applicant’s request to be retired as Lt Col with over 22 years for 1405 service be denied. DPPRRP agrees that an error did occur, but to grant the applicant the unearned service credit is not appropriate.

DPPRRP recommended that the applicant be allowed to retire in the grade of Lt Col, but only at the point in time he would have met the legal requirements (20 years active service, 10 years active commissioned service, and a minimum of 3 years time-in-grade (TIG)) to retire, which would be 1 Sep 98. By extending his retirement date out to his first retirement eligibility in the grade of Lt Col, the applicant would receive additional unserved active service credit of 3 years and 2 months. This retirement would be voluntary and would allow the applicant to retire with 20 years and 18 days of active service and 26 years, 5 months and 15 days of service for pay. The applicant’s 10 USC 1405 service would increase to 20 years, 4 months and 6 days.

A complete copy of this evaluation is appended at Exhibit D.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

A copy of the Air Force evaluation was forwarded to applicant on 1 September 2000 for review and response. As of this date, no response has been received by this office (Exhibit E).

---

THE BOARD CONCLUDES THAT:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was timely filed.

3. Sufficient relevant evidence has been presented to demonstrate the existence of a probable error or an injustice warranting partial relief. Because of the circumstances of the applicant's early retirement, i.e., failure of promotion to lieutenant colonel because of an inaccurate record, we agree with the office of primary responsibility (OPR) that he should be permitted to retire in the higher grade without returning to active duty. We disagree with the OPR and the applicant, however, concerning the amount of additional active service that should be awarded. The applicant asks that his records be corrected to reflect that he retired from active duty with 22 years and 2 months of service (1 July 2000). The OPR recommends his retirement with the minimum number of years of active military service to support his retirement in the higher grade of lieutenant colonel. Since the applicant does not want to return to active duty, at first blush, the recommendation of the OPR seems to be reasonable and fair to all concerned. However, after considering all of the circumstances, we do not believe the relief recommended by the OPR provides the applicant full and fitting relief. First, had the applicant elected to return to active duty, we would have recommended, and the approving official would have routinely approved, retroactive reinstatement on active duty at the earliest practicable date. Second, the applicant had no choice except to elect discharge or early retirement under the TERA on 1 July 1995 because he had been twice nonselected for promotion to the grade of lieutenant colonel based on grossly inaccurate records. Third, he commenced pursuing a correction of his records on 9 August 1994 (initial application to the ERAB) and, because he could not predict the outcome of his appeals, he had no recourse except to get on with his life. Moreover, until such time as he was notified by AFPC on 10 November 1999, he had no reason to make a decision concerning the possibility of returning to active duty. Finally, having been off of active duty for nearly five years, it is not at all surprising that the applicant would not elect to return and compete for promotion to colonel with no record of performance or experience as a lieutenant colonel. Having said this, however, we do not believe that equity or justice requires that he be allowed to pick a retirement date solely for his convenience. To the contrary, we believe that the applicant should be provided a retirement date approximately 90 days subsequent to being officially apprised of the necessity of making a decision regarding further military service. Except where necessary to validate a retroactive promotion to a higher grade, any active military service beyond this date, in our view, would constitute an unwarranted expenditure of public funds. In arriving at our decision, we are aware that the courts have held

that we have an abiding moral sanction to determine what constitutes an error or an injustice and to take steps to grant full and fitting relief. In view of the foregoing, we recommend the applicant's records be corrected to the extent indicated below.

---

THE BOARD RECOMMENDS THAT:

The pertinent military records of the Department of the Air Force relating to APPLICANT be corrected to show that:

a. He was promoted to the grade of lieutenant colonel, effective and with a date of rank of 1 August 1994.

b. He was not retired under the provisions of the Temporary Early Retirement Authority (TERA) on 1 July 1995, but on that date was continued on active duty and ordered permanent change of station to his home of record (home of selection) until 29 February 2000, on which date he was relieved from active duty and retired for length of service, effective 1 March 2000.

---

The following members of the Board considered this application in Executive Session on 14 December 2000, under the provisions of AFI 36-2603:

Mr. Thomas S. Markiewicz, Panel Chair
Mr. Joseph A. Roj, Member
Ms. Patricia D. Vestal, Member

All members voted to correct the records, as recommended. The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 17 Jul 00, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. ROP, Docket Number 95-00115 (Case 3).
Exhibit D. Letter, HQ AFPC/DPPRRP, dated 17 Aug 00, w/atchs.
Exhibit E. Letter, SAF/MIBR, dated 1 Sep 00.

THOMAS S. MARKIEWICZ
Panel Chair

AFBCMR 00-01988

MEMORANDUM FOR THE CHIEF OF STAFF

Having received and considered the recommendation of the Air Force Board for Correction of Military Records and under the authority of Section 1552, Title 10, United States Code (70A Stat 116), it is directed that:

The pertinent military records of the Department of the Air Force relating to APPLICANT be corrected to show that:

a. He was promoted to the grade of lieutenant colonel, effective and with a date of rank of 1 August 1994.

b. He was not retired under the provisions of the Temporary Early Retirement Authority (TERA) on 1 July 1995, but on that date was continued on active duty and ordered permanent change of station to his home of record (home of selection) until 29 February 2000, on which date he was relieved from active duty and retired for length of service, effective 1 March 2000.

JOE G. LINEBERGER
Director
Air Force Review Boards Agency

ADDENDUM TO
RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

DOCKET NUMBER: 00-00105 (Case 2)

COUNSEL: NONE

HEARING DESIRED: YES

---

APPLICANT REQUESTS THAT:

A waiver be granted for an exception to policy for retirement under the Fiscal Year 2000/2001 (FY00/01) Phase III Officer Early Retirement Program.

A waiver be approved for his remaining active duty service commitment for his permanent change of station.

A waiver be approved for the 120-day notification period prior to the retirement effective date.

---

RESUME OF THE CASE:

On 22 Apr 99, the Board considered an appeal pertaining to the applicant, in which he requested that his Officer Performance Report (OPR) closing 31 Oct 96 be declared void and removed from his records; his records be corrected to reflect award of the Meritorious Service Medal (MSM) for his duty at the United States Air Force (USAF) Academy; the SWC/AE medal be included in the record that goes before the supplemental promotion board; he be given Special Selection Board (SSB) consideration for promotion to the grade of lieutenant colonel by the CY98B Central Lieutenant Colonel Selection Board, which convened on 1 Jun 98, with his corrected record; and, if his record could not be satisfactorily corrected and he is not promoted to the grade of lieutenant colonel, he be allowed the option of early retirement in fiscal year (FY) 1999. The Board recommended that the contested OPR be voided and removed from his records, the applicant be awarded the MSM, and he be given SSB consideration. The recommendation of the Board was approved by the Director, Air Force Review Board’s Agency. The applicant’s requests for inclusion of the SWC/AE medal in his record and for early retirement were not favorably considered. A complete copy of the Record of Proceedings is at Exhibit I.

On 27 Jun 00, the Board considered and denied an appeal pertaining to the applicant, in which he requested that he be directly promoted to the grade of lieutenant colonel as though selected by the Calendar Year 1998B (CY98B) Lieutenant Colonel Board, which convened on 1 Jun 98; or, as an alternative, as an exception to policy, he be retired under the Fiscal Year 2000/2001 (FY00/01) Voluntary Early Retirement Program. A complete copy of the Record of Proceedings is at Exhibit J.

---

APPLICANT CONTENDS THAT:

The Board did not consider a memorandum from the DOD/IG team leader of his Whistleblower investigation.

He delayed applying for early retirement, in part, because of repeated assurances that the results of the DOD IG were forthcoming. With the encouragement of the DOD IG investigators, he had every reason to believe his reprisal claim would be quickly resolved. If the DOD IG had completed its investigation in a timely manner, the Temporary Early Retirement Authority (TERA) would have been available and he would have immediately applied for early retirement.

He does not request early retirement as an entitlement, but rather as a small measure of relief for the illegal reprisal actions he has endured. He believes his actions have always been reasonable and prudent--and certainly honorable. He has suffered injustices with the IG's lengthy delay and its flawed findings. The injustice continued after he was denied early retirement in Aug 99.

Applicant's complete submission, to include a statement from the DOD IG former team leader, is at Exhibit K.

---

AIR FORCE EVALUATION:

Pursuant to the Board staff's request, the Retirements Branch, AFPC/DPPRR, reviewed the applicant's most recent submission and recommended denial. According to DPPRR, the applicant met the eligibility criteria for the FY98 Officer Voluntary Early Retirement Program. At that time, he had the choice of either (1) applying for early retirement and (if he desired) then requesting to correct his records through the AFBCMR process an appeal to the SSB for promotion to the grade of lieutenant colonel, or (2) remaining on active duty and pursuing correcting his records and applying to the SSB for promotion to the grade of lieutenant colonel. However, the Air Force changed the eligibility for subsequent early retirement programs that made his Air Force specialty ineligible to apply. The Air Force made no offer or guarantee that, having completed all actions and

still not promoted by the SSB, his request for early retirement would be approved. Granting the applicant early retirement would establish an unwarranted precedent. Specifically, his records have been corrected and he has not demonstrated that he has been harmed by not choosing early retirement.

A complete copy of the DPPRR evaluation is at Exhibit L.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

Applicant reviewed the advisory opinion and furnished a response and additional documentary evidence. In his response, the applicant invoked the Military Whistleblower Protection Act under 10 USC 1034.

Applicant’s complete submission is at Exhibit N.

---

ADDITIONAL AIR FORCE EVALUATION

Pursuant to the Board staff’s request, the General Law Division, HQ USAF/JAG, reviewed the applicant’s request that his request for reconsideration be processed under 10 USC 1034, Military Whistleblower Protection Act. JAG indicated that once an application has been processed under the Military Protection Act, a subsequent request for relief based on the same allegation of reprisal is not entitled to expedited processing.

According to JAG, they doubt whether denial of a request for early retirement constitutes a prohibited personnel action as envisioned by the statute. The Air Force denied the applicant’s request for early retirement because he did not meet the eligibility requirements for the program, not because he made a protected communication. Consequently, the denial of the applicant’s request to retire early was not a personnel action prohibited by the Whistleblower Protection Statute (WPS). Thus, while the Board may certainly consider the application reconsideration request, it need not do so under the expedited processing requirements of the WPS. JAG indicated that they recommend it be processed under normal procedures.

A complete copy of the JAG evaluation is at Exhibit O.

---

APPLICANT'S REVIEW OF ADDITIONAL AIR FORCE EVALUATION:

Applicant reviewed the advisory opinion and furnished a response. In his response, the applicant indicated that he requested early retirement on 14 Jun 99 before SSB consideration. Clearly, his 14 Jun 99 memorandum stated that he wanted early retirement and not SSB promotion consideration.

Applicant’s complete response is at Exhibit Q.

---

THE BOARD CONCLUDES THAT:

1. Sufficient relevant evidence has been presented to demonstrate the existence of probable injustice regarding the applicant’s request for early retirement. After a thorough review of the applicant’s most recent submission, a majority of the Board is persuaded that corrective action is warranted. The majority took particular note of the statement from the former DOD IG investigator who indicated that he opined on the likely results of the DOD IG investigation to the applicant before the investigation was completed. He further stated that he knew the applicant was factoring the results of the investigation into a retirement decision, and that he recommended to the applicant that he wait for the IG results. While the majority is not of the opinion that it is the function of DOD IG investigator to offer career advice, given his official position of investigator, the majority believes it is reasonable to assume that the applicant relied, to his detriment, on the advice of the investigator. In view of the foregoing, and having no basis to question the integrity of this individual, the majority believes that it is in the interest of justice to favorably consider the applicant’s request for early retirement. Accordingly, a majority of the Board recommends that the applicant’s records be corrected as indicated below.

2. The applicant’s request that his request for reconsideration of his appeal be processed under the Military Whistleblower Protection Act (10 USC 1034) was noted. However, HQ USAF/JAG has indicated that once an application has been processed under the Military Protection Act, a subsequent request for relief based on the same allegation of reprisal is not entitled to expedited processing. We accept their assessment concerning this matter. Accordingly, the applicant’s request is not favorably considered.

---

THE BOARD RECOMMENDS THAT:

The pertinent military records of the Department of the Air Force relating to APPLICANT, be corrected to show that, as an exception to policy, he applied for retirement under the provisions of the Temporary Early Retirement Authority (TERA) and his application

was approved by competent authority; he registered on the Public and Community Service Registry prior to his retirement; and, that he is eligible to retire at the earliest practicable date.

---

The following members of the Board considered this application in Executive Session on 28 Jun 01 and 23 Jul 01, under the provisions of AFI 36-2603:

Mr. David W. Mulgrew, Panel Chair
Ms. Kathy L. Boockholdt, Member
Mr. Christopher Carey, Member

By a majority vote, the Board voted to correct the records, as recommended. Mr. Mulgrew voted to deny the appeal and submitted a minority report. The following additional documentary evidence was considered:

Exhibit I. Record of Proceedings, dated 8 Jun 99, w/atchs.
Exhibit J. Record of Proceedings, dated 4 Aug 00, w/atchs.
Exhibit K. Letter, applicant, dated 2 Jan 01, w/atchs.
Exhibit L. Letter, AFPC/DPPRR, dated 14 Mar 01.
Exhibit M. Letter, SAF/MIBR, dated 16 Mar 01.
Exhibit N. Letter, applicant, dated 23 Mar 01, w/atchs.
Exhibit O. Letter, HQ USAF/JAG, dated 2 Apr 91.
Exhibit P. Letter, AFBCMR, dated 10 Apr 01.
Exhibit Q. Letter, applicant, dated 17 Apr 01.
Exhibit R. Minority Report.

DAVID W. MULGREW
Panel Chair

AFBCMR 00-00105

MEMORANDUM FOR THE CHIEF OF STAFF

Having received and considered the recommendation of the Air Force Board for Correction of Military Records and under the authority of Section 1552, Title 10, United States Code (70A Stat 116), it is directed that:

The pertinent military records of the Department of the Air Force relating to , be corrected to show that, as an exception to policy, he applied for retirement under the provisions of the Temporary Early Retirement Authority (TERA) and his application was approved by competent authority; he registered on the Public and Community Service Registry prior to his retirement; and, that he is eligible to retire at the earliest practicable date.

JOE G. LINEBERGER
Director
Air Force Review Boards Agency

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

(DECEASED)

DOCKET NUMBER: 00-02254
INDEX NUMBER: 137.01; 128.14

COUNSEL: NONE

HEARING DESIRED: NO

---

APPLICANT REQUESTS THAT:

The Board approve a waiver of the 20-year requirement for retirement eligibility from the Air Force Reserve and that she be made eligible to receive an annuity under the Reserve Component Survivor Benefit Plan (RCSBP).

---

APPLICANT CONTENDS THAT:

At the time of her husband's death, he had amassed 19 years, 9 months and 25 days toward retirement. He had already exceeded his 50-point requirement toward his 20th year, ensuring that his 20th year was a "good year" toward retirement.

The applicant's complete submission is at Exhibit A.

---

STATEMENT OF FACTS:

The relevant facts pertaining to this application, extracted from the applicant's records, are contained in the letter prepared by the appropriate office of the Air Force at Exhibit C. Accordingly, there is no need to recite these facts in this Record of Proceedings.

---

AIR FORCE EVALUATION:

The Directorate of Personnel Program Management, ARPC/DPP, recommended that the application be disapproved. In order to establish eligibility for Reserve retired pay under the provisions of Title 10, United States Code, Section 12731, a member must complete 20 years of satisfactory service with the last 6 years of qualifying service in a Reserve component. The member completed 19 years, 9 months and 26 days of satisfactory service as of 7 July 2000, the date he was killed in an automobile accident. His Retention/Retirement (R/R) year was 12 September to 11 September.

Although he completed sufficient points for his full R/R year ending 11 September 2000, to be satisfactory, he died prior to completion of the 20th year. Since the member was not eligible for Reserve retired pay, the applicant is not eligible to apply for an annuity under the RCSBP.

A complete copy of the evaluation, with attachments, is at Exhibit C.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

The applicant reiterated her belief that she is entitled to an annuity under the RCSBP and requested that the Board reject the recommendation from ARPC/DPP. If her husband's R/R date had not been changed, he would have had 20 satisfactory years for retirement on the date of his accident. Her complete response is at Exhibit E.

---

THE BOARD CONCLUDES THAT:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was timely filed.

3. Sufficient relevant evidence has been presented to demonstrate the existence of probable injustice warranting favorable action on the applicant's requests. On the date of his death, the deceased member had sufficient points for a year of satisfactory service toward retirement. However, since his death occurred before the end of his retirement/retention year, he could not be credited with a "good year" of service to complete his 20th year. We do not believe that his family should be penalized for this tragedy. While it is not feasible to change his retirement/retention year after over 19 years, more than half of which were spent as a Navy resource, we have uncovered a solution whereby the deceased can reach 20 years of satisfactory Federal service toward retirement and his family can derive some remuneration for his service. Therefore, we recommend that the records be corrected as indicated below.

---

THE BOARD RECOMMENDS THAT:

The pertinent military records of the Department of the Air Force relating to APPLICANT, be corrected to show that:

a. He enlisted in the Air Force Reserve on 3 May 1977, and was credited with 6 nonpaid Inactive Duty Training (IDT) points and

3 membership points for the period of 3 May 1977 to 7 July 1977, resulting in 9 total points; and 2 months and 5 days of satisfactory Federal service toward retirement.

b. He was honorably discharged from the Air Force Reserve on 7 July 1977, to enlist in the United States Navy Reserve, without a break in service.

c. He applied for, and was transferred to the Retired Reserve, effective 6 July 2000, by reason of having completed 20 years toward retirement, and he elected full and immediate coverage for his spouse and children under the Reserve Component Survivor Benefit Plan (RCSBP), based on full retired pay (Option C).

---

The following members of the Board considered this application in Executive Session on 6 February 2001, under the provisions of AFI 36-2603:

Mr. David C. Van Gasbeck, Panel Chair
Ms. Patricia D. Vestal, Member
Mr. Joseph A. Roj, Member

All members voted to correct the records, as recommended. The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 7 Aug 2000, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. Letter, ARPC/DPP, dated 19 Oct 2000, w/atchs.
Exhibit D. Letter, SAF/MIBR, dated 3 Nov 2000.
Exhibit E. Letter, Applicant, dated 18 Nov 2000.

DAVID C. VAN GASBECK
Panel Chair

AFBCMR 00-02254

MEMORANDUM FOR THE CHIEF OF STAFF

Having received and considered the recommendation of the Air Force Board for Correction of Military Records and under the authority of Section 1552, Title 10, United States Code (70A Stat 116), it is directed that:

The pertinent military records of the Department of the Air Force relating to (DECEASED), , be corrected to show that:

a. He enlisted in the Air Force Reserve on 3 May 1977, and was credited with 6 nonpaid Inactive Duty Training (IDT) points and 3 membership points for the period of 3 May 1977 to 7 July 1977, resulting in 9 total points; and 2 months and 5 days of satisfactory Federal service toward retirement.

b. He was honorably discharged from the Air Force Reserve on 7 July 1977, to enlist in the United States Navy Reserve, without a break in service.

c. He applied for, and was transferred to the Retired Reserve, effective 6 July 2000, by reason of having completed 20 years toward retirement, and he elected full and immediate coverage for his spouse and children under the Reserve Component Survivor Benefit Plan (RCSBP), based on full retired pay (Option C).

JOE G. LINEBERGER
Director
Air Force Review Boards Agency

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

DOCKET NUMBER: 02-01500
INDEX CODE: 135.02

COUNSEL: NONE

HEARING DESIRED: NO

---

APPLICANT REQUESTS THAT:

He be given a waiver of the time required to be eligible for a Reserve retirement, or that he be allowed to serve the required time.

---

APPLICANT CONTENDS THAT:

He contacted the Air Reserve Personnel Center (ARPC) to inquire about how much his pension would be. He was informed that he only received credit for 18 years, 8 months, and 10 days of satisfactory service.

He then contacted a recruiter about going back and getting the time needed (approximately 38 days). His request was rejected due to the following reasons:

1. His age, 58 years old in Sep 01.

2. He has been out of the flight engineer career field for more that seven years and would have to go back to school.

3. All of the C-141's were to be out of McChord AFB by Apr 02, so there would be no requirement for flight engineers.

In support of his appeal, the applicant submitted a personal statement (including a short resume of his military career); estimated computations of retired pay; a copy of Reserve Order –----; AF Form 526, dated Jun 78, and an honorable discharge certificate.

Applicant's complete submission is at Exhibit A.

---

STATEMENT OF FACTS:

ARPC Form 168, Computation for AF Form 526, dated 29 May 2002, reflects that the applicant served in the U.S. Marine Corps Reserve (USMCR) from 16 June 61 to 25 June 61. He was then in

the U.S. Marine Corps (USMC) from 26 June 61 to 7 Oct 66 and in the USMCR from 8 Oct 66 until 15 Jun 67. He was in civilian status from 16 Jun to 17 Jul 67. He served in the Regular Air Force from 18 Jul 67 until 15 Dec 72. He transferred to the Air Force Reserve on 16 Dec 72, and had continuous participation until his Retirement Year Ending (RYE) 15 Dec 83. He was honorably discharged from the Air Force Reserve effective 7 Jan 89. The applicant completed a total of 18 years, 8 month, and 10 days of satisfactory Federal service.

An AF Form 526 (ANG/USAFR Point Credit Summary), dated 15 Feb 86, addressed to the applicant, reflects that as of Retirement Year Ending (RYE) 15 December 1985 he had 18 years, 8 months, and 10 days of satisfactory service.

---

AIR FORCE EVALUATION:

HQ ARPC/DPP recommended denial. They state that based on an analysis of the applicant's record, he completed 18 years, 8 months, and 10 days of satisfactory service. In order for him to qualify for retirement benefits, he must complete 20 years of satisfactory federal service, with the last eight years in a reserve component, as required by US Code, Title 10, Section 12731. They further state that the applicant would need an additional 1 year, 3 months, and 20 days of satisfactory service to gain eligibility for retired pay.

A complete copy of the Air Force evaluation is at Exhibit C.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

On 31 Jul 02, applicant submitted a copy of his original request, with attachments. In his personal statement, he added the following information:

He served from 1972 until 1989 in the Reserve. He had 4826 points. He states that during the time he supposedly retired, he had a form indicating he was a master sergeant (MSgt) with over 26 years for pay, and that no one in his unit ever mentioned that he only had 18 years, 8 months, and 10 days.

He is willing to do whatever it takes to acquire the needed time and he really does not want to lose his pension because of an oversight on his part and that of the squadron clerk at the time.

Applicant's complete response is at Exhibit E.

---

THE BOARD CONCLUDES THAT:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was not timely filed; however, it is in the interest of justice to excuse the failure to timely file.

3. Sufficient relevant evidence has been presented to demonstrate the existence of error or injustice. After careful review of the limited records and the applicant's submission, it appears the applicant believed that he had sufficient satisfactory service, to include his service in the US Marine Corps, the Regular Air Force and Air Force Reserve, to be eligible for a Reserve retirement. However, when he inquired as to what his pension would be, he was advised that he had only been credited with 18 years, 8 months, and 10 days of satisfactory service and would not be eligible for retired pay. He further states that at the time that he supposedly retired, he had a form stating that he was a master sergeant with over 26 years for pay. At no time did anyone mention the fact that he had only 18 years, 8 months, and 10 days of satisfactory service. In view of this, we believe that if the applicant had been properly briefed and understood that he had not completed the required 20 years of satisfactory service, he would have continued to participate until he had acquired the required service to be eligible for retirement. Therefore, to preclude any injustice to the applicant, we believe that the applicant should be credited the additional service to make him eligible for a Reserve retirement. Accordingly, we recommend that his records be corrected as indicated below.

---

THE BOARD RECOMMENDS THAT:

The pertinent military records of the Department of the Air Force relating to APPLICANT, be corrected to show that:

a. He was credited with six (6) additional nonpaid inactive duty training (IDT) points during the retirement/retention year 16 December 1976 through 15 December 1977, resulting in 50 total and retirement points and a satisfactory year of Federal service.

b. He was credited with twenty-one (21) additional nonpaid inactive duty training (IDT) points during the retirement/retention year 16 December 1978 through 15 December 1979, resulting in 50 total and retirement points and a satisfactory year of Federal service.

---

The following members of the Board considered AFBCMR Docket Number 02-01500 in Executive Session on 9 Oct 02, under the provisions of AFI 36-2603:

Mr. Vaughn E. Schlunz, Panel Chair
Mr. Clarence D. Long III, Member
Ms. Brenda L. Romine, Member

All members voted to correct the records, as recommended. The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 31 Dec 01, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. Letter, HQ ARPC/DPP, dated 25 Jun 02, w/atchs.
Exhibit D. Letter, SAF/MRBR, dated 3 Jul 02.
Exhibit E. Letter, Applicant, undated, w/atchs.

VAUGHN E. SCHLUNZ
Panel Chair

MEMORANDUM FOR THE EXECUTIVE DIRECTOR, AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS (AFBCMR)

FROM: SAF/MR

SUBJECT: AFBCMR Case on Former Applicant

I have carefully considered all the circumstances of this case and do not agree with the recommendation of the AFBCMR panel to grant the applicant's request for a correction of records to render him eligible for Reserve retired pay at age 60.

In his application to the Board, the applicant contends that during the time he supposedly retired, he had a form indicating he was a MSgt with over 26 years of service for pay, and that no one in his unit ever mentioned that he only had 18 years, 8 months, and 10 days of satisfactory service. Other than his own personal statement, the applicant provides no corroborative evidence to support his assertions.

The Board accepts the applicant's assertions that when he retired from the Reserve, he had a form stating that he was a MSgt with over 26 years for pay and that at no time did anyone mention that he had only a little over 18 years of service at face value. Thus, the Board believes that, had the applicant been properly briefed and understood he had not completed 20 years of satisfactory service, he would have continued to participate until he was retirement eligible.

Congress established retirement eligibility at age 60 with 20 years of satisfactory service unless the member was involuntarily separated due to force reduction or medical disqualification. The available records reflect that the applicant had over 10 years of active duty service and a little over 16 years of service in a Reserve component. However, he performed only eight years of satisfactory service towards retirement during these years. Had he completed two of these years satisfactorily, he would have been retirement eligible when he reached age 60.

I recognize the applicant's disappointment in not being eligible for Reserve retired pay upon attaining age 60. Nonetheless, absent substantive evidence of miscounselling by responsible Air Force personnel, I am compelled to deny his request. To do otherwise, in my view, would be grossly unfair to numerous reservists who do not qualify for retired pay because, for reasons of their own, they fail to acquire the requisite number of satisfactory years of federal service. Accordingly, it is my decision that the applicant's request be denied.

MICHAEL L. DOMINGUEZ
Assistant Secretary
(Manpower and Reserve Affairs)

Attachment:
Complete Case File

DODI 1336.6 Correction of Military Records, December 28, 1994, ASD(FMP)

**** Text of the Regulation ****

References: (a) Section 1552 of title 10, United States Code

(b) DoD Directive 5124.5, "Assistant Secretary of Defense

for Force Management Policy (ASD(FMP)),"

October 31, 1994

A. PURPOSE

This Instruction:

1. Implements policy, assigns responsibilities and prescribes procedures for obtaining approval of procedures established by a Secretary of a Military Department, under reference (a), to correct any military record of the Military Department when the Secretary considers it necessary to correct an error or remove an injustice.

2. Assigns responsibilities for maintaining the record of approval.

B. APPLICABILITY

This Instruction applies to the Office of the Secretary of Defense and the Military Departments.

C. POLICY

It is DoD policy that:

1. Procedures established by the Secretaries of the Military Departments for the correction of military records must conform to the

requirements of reference (a) and this Instruction.

2. The procedures shall include rules governing the operation and conduct of boards for the correction of military records. At a minimum, such rules shall provide:

a. That the purpose of the board is to consider individual applications and determine whether or not an error or injustice exists in a particular case, and, if so, to fashion relief appropriate to the facts and circumstances of each case.

b. The scope of the board's authority.

c. That applicants must submit individual applications.

d. That before granting relief, sufficient evidence must be on the record to indicate a probable material error or injustice in the case of the particular applicant concerned.

D. RESPONSIBILITIES

1. The Assistant Secretary of Defense for Force Management Policy shall under DoD Directive 5124.5 (reference (b)) review and approve procedures established by the Secretaries of the Military Departments for the correction of military records under the authority of 10 U.S.C. 1552 (reference (a)).

2. The Secretaries of the Military Departments may correct any military record of a Military Department when the Secretary considers it necessary to correct an error or remove an injustice under the authority of reference (a). The Secretary concerned shall prepare procedures for

the correction of military records and obtain approval of such procedures in accordance with this Instruction. Additionally, the Secretary of the Military Department shall maintain a permanent record of each approval.

E. PROCEDURES

The Secretaries of the Military Departments shall submit their procedures governing correction of military records for approval to the Assistant Secretary of Defense for Force Management Policy.

F. EFFECTIVE DATE AND IMPLEMENTATION

This Instruction is effective immediately. Procedures for the correction of military records established and approved before the effective date of this Instruction remain valid until new approvals are granted. Forward two copies of implementing documents to the Assistant Secretary of Defense for Force Management Policy within 120 days.

F. Pang

Assistant Secretary of Defense

(Force Management Policy)