# In the United States Court of Federal Claims

No. 05-455 C
(Filed: June 13, 2007)

| | |
|---|---|
| CORT ANCMAN and EILEEN ANCMAN, Plaintiffs, v. THE UNITED STATES, Defendant. | Motion to Dismiss; Jurisdiction; Secretary of the Air Force's Rejection of the Recommendation of the Air Force Board for Correction of Military Records; Retirement Pay; 37 U.S.C. § 204; 10 U.S.C. § 1552 |

Margaret K. Krasik, Pittsburgh, PA, for plaintiffs.

Douglas K. Mickle, United States Department of Justice, Washington, DC, for defendant.

## OPINION

**SWEENEY**, Judge

Before the court are Defendant's Motion to Dismiss, or in the Alternative, Motion for Judgment Upon the Administrative Record ("motion" or "Mot.") and Plaintiffs' Cross-Motion for Judgment on the Administrative Record ("cross-motion"). In this case, plaintiffs, upon retirement from the United States Air Force ("Air Force"), learned that their actual retirement pay differed significantly from the estimates they received before applying for retirement. After investigating the cause of the discrepancy, plaintiffs instituted an administrative proceeding before the Air Force Board for Correction of Military Records ("AFBCMR"), seeking an increase in their retirement pay to match the retirement pay estimates. The AFBCMR issued a recommended ruling favorable to plaintiffs, which was rejected by the Secretary of the Air Force. In this court, plaintiffs request a ruling that directs the Air Force to increase their retirement pay to the estimated retirement pay that they were quoted, provide them with their back retirement pay differential, and to pay them compensatory damages. For the reasons set forth below, the court finds that it lacks jurisdiction to consider the merits of some of plaintiffs' claims and that plaintiffs have failed to state a claim upon which relief can be granted for their remaining claims. Accordingly, defendant's motion is granted and plaintiffs' motion is denied.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiffs are both retired Air Force majors. Compl. ¶ 3. At the time of their retirement, plaintiff Cort Ancman had accumulated 15 years, 3 months, and 11 days of active service and plaintiff Eileen Ancman had accumulated 15 years, 8 months, and 14 days of active service. Id. ¶ 5; AR1 at 18; AR2 at 17.

On December 2, 1997, plaintiffs applied and were approved for early retirement pursuant to the Fiscal Year 1998 Drawdown Program for Temporary Early Retirement Authority ("TERA"), Pub. L. No. 102-484, § 4403, 106 Stat. 2315, 2702-04 (1992) (codified as amended at 10 U.S.C. § 1293 note), effective August 31, 1998. Compl. ¶ 6; AR1 at 25; AR2 at 22. Prior to submitting their retirement applications, plaintiffs were required to review and sign a Retirement Pre-Application Checklist, which acknowledged their receipt of a retirement pay estimate. AR1 at 26, 28-30; AR2 at 23, 25-27. Plaintiffs' retirement pay estimates, provided by the Pentagon Manpower Personnel Flight ("Pentagon MPF"), were $1,482 per month for plaintiff Cort Ancman and $1,535 per month for plaintiff Eileen Ancman. Compl. ¶ 7; AR1 at 16; AR2 at 15. The computer-generated estimates included the following cautionary statement: "The dollar amount shown below is an ESTIMATE of your retirement pay. This ESTIMATE is based on the 1997 Pay Scale. This ESTIMATE is before taxes. Contact DFAS-CL for official retired pay estimates: DFAS-CL, Attn: ROB, P.O. Box 99191, Cleveland, OH 44199."[2] AR1 at 16; AR2 at 15. Plaintiffs allege that they were told that the estimates were accurate to within $1 to $2. Compl. ¶ 7; AR1 at 12; AR2 at 11.

Pursuant to the TERA, plaintiffs retired on August 31, 1998, each with the grade of major. Compl. ¶ 8. But see AR1 at 18 (indicating a retirement date of September 1, 1998); AR2 at 17 (same). On September 25, 1998, plaintiffs each received a Summary of Retired Pay Account from the DFAS-CL, which stated the actual monthly retirement pay of $1,393 for plaintiff Cort Ancman and $1,413 for plaintiff Eileen Ancman. Compl. ¶ 9; AR1 at 18-19; AR2 at 17-18. Plaintiffs' monthly combined actual retirement pay was $211 less than their estimated retirement pay. Plaintiffs contend that they had made "life changing decisions" based upon their estimated retirement pay and that they would not have retired had they known that their actual retirement pay would be so much less than their estimated retirement pay. AR1 at 12, 33; AR2 at 11, 30.

---

[1] The facts are taken from the complaint ("Compl.") and the administrative records. Using defendant's conventions, plaintiff Eileen Ancman's administrative record is cited as "AR1" and plaintiff Cort Ancman's administrative record is cited as "AR2." Although reference to the administrative records was not necessary for the court to reach its legal conclusions, the court cites the administrative records to more fully explain what occurred in plaintiffs' cases.

[2] "DFAS-CL" is an abbreviation for the Defense Finance and Accounting Service–Cleveland Center. See, e.g., AR1 at 25; AR2 at 22.

To investigate the discrepancy between their retirement pay estimates and actual retirement pay, plaintiffs visited Nellis Air Force Base ("Nellis") on October 7, 1998. Compl. ¶ 10. Officials at Nellis provided monthly retirement pay estimates of $1,398 for plaintiff Cort Ancman and $1,448 for plaintiff Eileen Ancman. Id. ¶ 10; AR1 at 17; AR2 at 16. The Nellis estimates, when combined, were $40 less per month than plaintiffs' actual retirement pay. Upon receiving these figures, plaintiffs came to believe that the computer model used by the Air Force to estimate retirement pay was faulty. Compl. ¶ 10. Officials at Nellis ran the model for plaintiffs several times, and obtained different pay estimates each time. Id. Concerned about the accuracy of the computer model, officials at Nellis sent a facsimile inquiry to the responsible entity, the Air Force Personnel Center ("AFPC"). Id.; AR1 at 15; AR2 at 14. The inquiry, transmitted on October 7, 1998, with the subject line "Retired Pay Calculator Inaccuracies," stated the following:

> Please see enclosed information re: estimate of Maj Ancman and spouse's retired pay. Understandably, the Pentagon where she retired from based the first estimates on the 97 pay calculator. We are concerned, however, that there is still a discrepancy with the 98 pay calculator, especially since the pay should be higher for 98 estimates. Your attention to this matter is appreciated.

Compl. ¶ 10; AR1 at 15; AR2 at 14. Plaintiffs also telephoned Senior Master Sergeant Feroz A. Essa at the AFPC on October 7, 1998, who purportedly told plaintiffs that the estimates were accurate to within $1 to $2. AR1 at 12, 35, 59; AR2 at 11, 32, 56; see also AR1 at 59 (Senior Airman Kelley T. Klimek's statement confirming plaintiffs' account of their conversation with Sergeant Essa); AR2 at 56 (same); AR1 at 23 (Sergeant Essa's statement that the estimates were "usually within a few dollars from the actual DFAS calculated pay"). But see AR1 at 23 (Sergeant Essa's denial that he said that the estimates were accurate to within $1 to $2). Sergeant Essa also advised plaintiffs that the amounts provided by the Pentagon MPF on December 2, 1997 were estimates only, and that plaintiffs "should have sought out 'other opinions'" concerning the amounts of their retired pay pursuant to the disclaimers included with the estimates. AR1 at 14, 23; AR2 at 13. Finally, Sergeant Essa advised plaintiffs of their option to initiate an administrate review to challenge the amount of their retirement pay. AR1 at 14; AR2 at 13.

Plaintiffs initiated an administrative review the next day, seeking an increase in their actual retirement pay to the amount that had been provided to them in their estimates. Compl. ¶ 11; AR1 at 11-12, 21; AR2 at 10-11, 20. Upon receipt of plaintiffs' application, the AFBCMR solicited advisory opinions from the AFPC. AR1 at 4-5; AR2 at 4-5. The advisory opinions, prepared by Lieutenant Colonel Bret Stevens on November 25, 1998, AR1 at 25-27, AR2 at 22-24, explained why the estimates provided by the Pentagon MPF and Nellis were incorrect:

> [W]e discovered incorrect information had been used in both retirement calculations. When the applicant received the Dec 97 estimate, an official 10 USC 1405 service date had not yet been computed by AFPC's Retirements

> Branch personnel. Normally, this date is not produced until an individual reaches 18 years of service. However, for early retirements, it is produced by the Retirements Branch at the time the applicant's retirement application is approved. As a substitute, either the applicant's pay date or total active federal military service date (TAFMSD) could be used for the 10 USC 1405 service date, but with varying results. The bottom line: the Pentagon MPF could not provide the applicant with a correct estimate without the official 10 USC 1405 date, required to properly use the retirement calculator.
>
> For reasons we cannot explain, both MPFs substituted the applicant's pay date for the 10 USC 1405 date when preparing the estimates. Because the applicant's pay date was used, the computation provided a higher pay multiplier and, therefore, produced a higher retirement pay estimate.

AR1 at 26; AR2 at 23. However, Colonel Stevens also noted that plaintiffs had the opportunity to request an official estimate from DFAS-CL, but that there was no evidence that plaintiffs did so. AR1 at 26-27; AR2 at 23-24. Colonel Stevens concluded that plaintiffs had not "clearly demonstrated" that the difference between their estimated retirement pay and their actual retirement pay "substantiates that an injustice has taken place," and thus recommended that plaintiffs' requests be denied. AR1 at 26-27; AR2 at 23-24.

The Air Force forwarded Colonel Stevens's advisory opinions to plaintiffs for their review and response on December 14, 1998. AR1 at 32; AR2 at 29. Plaintiffs responded to Colonel Stevens's advisory opinions by letter memorandum dated January 4, 1999. AR1 at 33-42; AR2 at 30-39. Plaintiffs' extensive response was directed at several aspects of Colonel Stevens's opinions, including representations made about the accuracy of the retirement pay models, the Air Force's use of incorrect data to compute the retirement pay estimates, plaintiffs' attempts to contact DFAS-CL,[3] the force and effect of the retirement checklist signed by plaintiffs, and the injustice suffered by plaintiffs. AR1 at 33-42; AR2 at 30-39. Plaintiffs

---

[3] Plaintiffs do not provide the dates that they allegedly attempted to contact the DFAS-CL (i.e., whether the attempted contacts occurred before or after their retirement). In fact, the administrative record is murky on this issue. On the one hand, plaintiffs did contact one of their United States senators, Senator Richard Bryan, to request that he inquire about their dilemma with the DFAS-CL. AR1 at 39, 61-62; AR2 at 36, 58-59. The date of their request is not included in the administrative record, but Senator Bryan apparently sent a facsimile inquiry to the DFAS-CL on October 9, 1998, and the DFAS-CL responded via letter dated October 30, 1998. AR1 at 61; AR2 at 58. On the other hand, in a March 8, 2000 letter to United States Senator Harry Reid, plaintiffs indicate that they attempted to contact the DFAS during the week that they were allegedly given to contemplate early retirement. AR1 at 71; AR2 at 70. Plaintiffs did not identify the exact "week," but their implication is that the attempted contact occurred sometime around December 2, 1997.

supplemented their responses by electronic mail on January 9, 1999, averring, among other things:

> The AF calculates that 1405 date for people requesting the 15 year early retirement only upon approval of their application for retirement. In Cort Ancman's case, HQ AFPC took an extremely long time in calculating his 1405 date. Although his retirement was approved, it still took many additional months, plus many phone calls to HQ AFPC, to get someone to calculate his 1405 date. During the many months it took for this 1405 date to be calculated, Cort ran into the following problems:
>
> - Without the 1405 date, his retirement orders could not be issued.
>
> - Without retirement orders, he could not set up his household goods move.
>
> However, with time running out to [set up] his household goods move, the Pentagon MPF typed up a letter he could use instead of his orders to start the household goods move process.

AR1 at 67-68; AR2 at 64-65.

Based upon the evidence provided by plaintiffs and the Air Force, the AFBCMR concluded that "[s]ufficient relevant evidence has been presented to demonstrate the existence of probable error or injustice warranting partial relief" of plaintiffs' requests. AR1 at 7; AR2 at 6. The AFBCMR found that plaintiffs were 25% responsible and the Air Force was 75% responsible for the discrepancy between the estimates and plaintiffs' actual retirement pay. Compl. ¶ 12; AR1 at 7; AR2 at 7. To implement its findings, the AFBCMR recommended that the Air Force correct plaintiffs' military records to show that both plaintiffs were commissioned second lieutenants in the Reserve of the Air Force and that they both entered extended active duty on dates earlier than those reflected in their records. AR1 at 7; AR2 at 7. Such a correction would increase plaintiff Cort Ancman's monthly retirement pay by $67.50 and plaintiff Eileen Ancman's monthly retirement pay by $91.50. Compl. ¶ 12.

However, on November 30, 1999, the Assistant Secretary of the Air Force (Manpower, Reserve Affairs, Installations and Environment) ("Assistant Secretary"), the Secretary of the Air Force's designated representative to review the recommendations of the AFBCMR, exercised her discretion and rejected the findings of the AFBCMR. Id. ¶ 13; AR1 at 2, 9-10; AR2 at 2, 8-9. The Assistant Secretary found:

> It is indeed unfortunate that the Pentagon MPF provided the applicants grossly inaccurate estimates of their retired pay at the time they requested early retirement. Nonetheless, the estimates were clearly identified as such and

> provided the address of the proper source to obtain official estimates. In addition, the applicants had almost nine months to confirm the accuracy of the Pentagon MPF estimates before retirement and, other than their own self-supporting statements that they attempted to call DFAS on numerous occasions, we have no evidence of any action on their part. I note the assertion that they were told by the Pentagon MPF that though the pay estimator was not exact, it was within $1 - $2 of what they would be getting in retired pay and, therefore, there was no need to contact DFAS because they could not provide a better estimate without the 1405 date. However, I find no evidentiary support for this assertion from the Pentagon MPF. Absent corroborative evidence from the Pentagon MPF or an indication that the applicants were provided inaccurate estimates of their retired pay from DFAS, I find no compelling basis to provide them additional retirement benefits for periods of service in which they did not serve. In my view, if the exact amount of retired pay were crucial to their decisions to accept early retirement, the failure to seek official confirmation of the Pentagon estimates from DFAS before retirement, when clearly invited to do so, is inexcusable and militates against the granting of relief.

AR1 at 2, 9-10; AR2 at 2, 8-9. The AFBCMR forwarded the Assistant Secretary's decision to plaintiffs on December 20, 1999. AR1 at 2; AR2 at 2.

Plaintiffs wrote to Senator Harry Reid on March 8, 2000, to request a congressional inquiry into their cases. Compl. ¶ 14; AR1 at 71-72; AR2 at 70-71. On July 17, 2000, Colonel Walter Washabough, Chief of the Congressional Inquiry Division, responded to Senator Reid's inquiry and noted that the decision of the Assistant Secretary was the final Air Force decision in plaintiffs' cases. Compl. ¶ 15; AR1 at 75.

In April 2004, plaintiffs filed a pro se complaint in federal district court.[4] Compl. ¶ 16. The district court issued an order on October 19, 2004, transferring the complaint to this court. Id. ¶ 17. The transfer was not effectuated until April 2005. Id. Plaintiffs filed their transfer complaint on April 27, 2005.

Defendant filed the instant motion on November 7, 2005. Plaintiffs responded by filing a motion to transfer the case back to federal district court on March 29, 2006. Treating the transfer motion as a response to its dispositive motion, defendant filed Defendant's Reply to Plaintiffs' Response to Defendant's Motion to Dismiss, and in the Alternative, Motion for Judgment Upon the Administrative Record ("Reply") on April 18, 2006. After convening a status conference, the court denied plaintiffs' transfer motion in a May 12, 2006 order, and directed plaintiffs to file a response to defendant's motion. Plaintiffs subsequently retained counsel, who filed Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss, and Plaintiffs' Cross-Motion for

---

[4] Plaintiffs did not retain counsel until a substantive response to the instant motion was required. All prior submissions, including their complaint, were filed pro se.

Judgment on the Administrative Record ("opposition" or "Opp'n") on February 5, 2007. Defendant then filed Defendant's Second Reply to Plaintiffs' Second Response to Defendant's Motion to Dismiss, and in the Alternative, Motion for Judgment Upon the Administrative Record ("Second Reply") on March 12, 2007. The court deems oral argument unnecessary.

## II. DEFENDANT'S MOTION TO DISMISS

Defendant seeks dismissal of plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). With respect to a motion to dismiss pursuant to RCFC 12(b)(1), plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim. If the court finds that it possesses jurisdiction to entertain one or all of a plaintiff's claims, it still must dismiss, pursuant to RCFC 12(b)(6), any claim where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

### A. Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties or the court sua sponte may challenge the existence of subject matter jurisdiction at any time. Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States, and that do not sound in tort. 28 U.S.C. § 1491(a)(1) (2000). The Tucker

Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994). In order to find that a statute or regulation is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967); see also id. at 1009 ("Under Section 1491, what one must always ask is whether the constitutional clause or legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.").

**B. Only One of the Three Statutes Cited in Plaintiffs' Complaint–37 U.S.C. § 204–Is Money-Mandating**

Plaintiffs' complaint advances two causes of action, one for declaratory relief and one for breach of contract.[5] In addition to seeking the monetary damages based upon the retirement pay differential, plaintiffs request "compensatory damages for pecuniary [sic] losses, including pain and suffering, emotional distress and mental anguish." Compl. 9, at ¶ 4. Claims for pain and suffering, emotional distress, and mental anguish sound in tort, and this court does not possess jurisdiction over tort claims. 28 U.S.C. § 1491(a)(1); see also Curry v. United States, 609 F.2d 980, 983 (Ct. Cl. 1979) (declaring the torts of emotional distress and anguish as outside of the court's jurisdiction); Pratt v. United States, 50 Fed. Cl. 469, 482 (2001) (holding that the court lacks jurisdiction to award damages for pain and suffering). Accordingly, plaintiffs' tort claims are dismissed.

To determine whether jurisdiction lies over the remaining claims, the court must ascertain whether any of the statutes identified in plaintiffs' complaint is money-mandating. Loveladies Harbor, Inc., 27 F.3d at 1554. Then, according to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), "[i]f the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course." Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc portion). In other words, if plaintiffs have identified a money-mandating statute, then the court's jurisdictional inquiry ends and a merits determination begins.

---

[5] To the extent that plaintiffs seek an adjustment of their military retirement pay, their claim is not one for breach of contract. Plaintiffs' right to retirement pay is based on statute, not contract. United States v. Larionoff, 431 U.S. 864, 869 (1977); Zucker v. United States, 758 F.2d 637, 640 (Fed. Cir. 1985). Thus, the court will treat plaintiffs' "breach of contract" claim as a claim premised on a statutory entitlement.

In their complaint, plaintiffs allege jurisdiction based upon the following statutes: the Tucker Act; the statute providing entitlement to basic pay for the uniformed services, 37 U.S.C. § 204 (2000); and the statute providing for the correction of military records, 10 U.S.C. § 1552 (2000). As explained above, the Tucker Act provides jurisdiction only where there is a "substantive right enforceable against the United States for money damages," and is not, in itself, money-mandating. Testan, 424 U.S. at 398. Thus, the Tucker Act, standing alone, does not permit this court's exercise of jurisdiction over plaintiffs' complaint.

Similarly, the Federal Circuit has concluded that 10 U.S.C. § 1552 is not a money-mandating statute providing a separate and distinct cause of action under the Tucker Act.[6] Martinez v. United States, 333 F.3d 1295, 1315 (Fed. Cir. 2003). In Martinez, the Federal Circuit explained:

> Section 1552 is "money-mandating" in the sense that it requires that the government grant monetary relief to a service member if the correction board determines that the service member's record should be corrected in a way that entitles the service member to back pay. . . . But section 1552 is not the source of the right to back pay; that right comes from a different statute, such as the Military Pay Act, 37 U.S.C. § 204. Accordingly, . . . section 1552 is not the "money-mandating" statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims.

Id. at 1314-15. Thus, despite plaintiffs' arguments to the contrary, Opp'n 21-25, 10 U.S.C. § 1552 does not provide this court with a basis to exercise its jurisdiction over plaintiffs' complaint.

However, as noted above, the Federal Circuit in Martinez holds that 37 U.S.C. § 204 is a money-mandating statute. 333 F.3d at 1315; see also Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006) (noting 37 U.S.C. § 204's "money-mandating status"). Pursuant to the Federal Circuit's holding in Fisher, plaintiffs' assertion of jurisdiction pursuant to 37 U.S.C. § 204, a money-mandating statute, ends the court's jurisdictional inquiry. 402 F.3d at 1173. The court has jurisdiction to entertain plaintiffs' claims under 37 U.S.C. § 204.

---

[6] In a footnote, the Federal Circuit notes that 10 U.S.C. § 1552 can be money-mandating in two circumstances: (1) "if the plaintiff should have been retired for disability but the Correction Board illegally failed to so find" or (2) "when the correction board has granted relief and the service member seeks to enforce or challenge the implementation or scope of the remedial order . . . ." Martinez v. United States, 333 F.3d 1295, 1315 n.4 (Fed. Cir. 2003) (citation omitted). Here, neither exception applies.

**C. Plaintiffs' Complaint Fails to State a Claim Pursuant to 37 U.S.C. § 204 Upon Which Relief Can Be Granted**

As the Federal Circuit made clear in Fisher, once a court determines that it possesses jurisdiction by way of a money-mandating statute, the court then turns to a merits determination as to whether plaintiffs' factual allegations support a claim for relief. Id. In Fisher, the Federal Circuit held that while plaintiff properly invoked this court's jurisdiction by grounding his claim for relief on a money-mandating statute, plaintiff was unable to prove all of the elements of his claim. Id. at 1174-75. Here, the only money-mandating statute relied upon by plaintiffs is 37 U.S.C. § 204, which governs service members' entitlement to basic pay. See Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997) ("It is well-established that 37 U.S.C. § 204 . . . serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge."); id. ("37 U.S.C. § 204 'confers on an officer the right to the pay of the rank he was appointed to up until he is properly separated from the service'" (citing Sanders v. United States, 594 F.2d 804, 810 (1979) (en banc), abrogated in part on other grounds by the Defense Officer Personnel Management Act, Pub. L. No. 96-513, § 105, 94 Stat. 2835, 2859-60 (1980) (codified as amended at 10 U.S.C. § 628(b) (2000)))). However, plaintiffs make no claims for reinstatement or basic pay in their complaint; instead, their claim is limited solely to an adjustment to their retirement pay. Compl. 8-9, at ¶¶ 2-3. Thus, while 37 U.S.C. § 204 is money-mandating, it does not provide the appropriate mechanism for the relief requested by plaintiffs. It is not sufficient for a statute to be money-mandating; rather, the relief sought by plaintiffs must be the same kind of relief or remedy provided by the statute. Accordingly, plaintiffs fail to state a claim upon which relief can be granted under 37 U.S.C. § 204.[7] Thus,

---

[7] Because 37 U.S.C. § 204 does not provide the relief requested by plaintiffs, the court need not address the merits of plaintiffs' argument that their separation from the Air Force was involuntary because they reasonably relied upon the Air Force's retirement pay estimates in deciding to take early retirement. See Opp'n 26-27. Further, there is no evidence that plaintiffs raised the issue of voluntariness before the AFBCMR. Thus, plaintiffs have waived this argument. Metz, 466 F.3d at 998 ("[T]he issue of voluntariness is not a question of subject matter jurisdiction and therefore, a plaintiff may waive an argument with respect to that issue by not asserting it before the Board."); id. at 999 ("Because [plaintiff] did not assert in either his initial or reconsideration petition before the Board, that his separation was involuntary . . . , we conclude that he waived his ability to challenge the Board's decision based on the voluntariness of his separation."). Finally, plaintiffs did not raise the voluntariness argument in this case until they filed their opposition to defendant's motion. See Opp'n 25-29. As noted by defendant, Second Reply 15, plaintiffs have not moved to amend their complaint to add these allegations. As stated above, plaintiffs filed their complaint pro se. Normally, the court would read such a complaint broadly and excuse the pro se plaintiffs for a failure to amend their complaint. See Hughes v. Rowe, 449 U.S. 5, 9 (1980) (citing Haines v. Kerner, 404 U.S. 519, 520 (1972)). However, subsequent to filing their complaint, plaintiffs retained counsel. Plaintiffs' counsel did not move to amend the complaint. As a result, the court is not inclined to read the complaint

because plaintiffs rely upon 37 U.S.C. § 204 but their claims do not seek relief within 37 U.S.C. § 204, their claims are dismissed. As explained in Fisher:

> Assuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the initial determination that plaintiff's cause rests on a money-mandating source, the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted.

402 F.3d at 1175-76.

## III. OTHER POSSIBLE STATUTORY AND REGULATORY BASES FOR RECOVERY

If the court limited its analysis to those jurisdictional bases set forth in the complaint, plaintiffs are left with no viable claims. However, as alluded to by the parties in their motions and supporting briefs, plaintiffs' complaint implies other statutory and regulatory bases for their monetary claims. See Mot. 16-17; Opp'n 12-16, 20-21; Reply 6-7; Second Reply 7-11, 13. In particular, in their opposition, plaintiffs cite several alternative statutory and regulatory bases for this court's jurisdiction. Opp'n 12-16, 20-21. Although plaintiffs failed to amend their complaint to add these new jurisdictional allegations,[8] the court believes that a discussion of these statutes and regulations will provide plaintiffs with a full understanding of their case.

### A. The Air Force Retirement Pay Statute, if Alleged, Would Have Provided This Court With Jurisdiction

First, as alluded to by the parties, Mot. 16, Opp'n 12-13, Reply 6, Second Reply 7-8, plaintiffs clearly seek an adjustment of their retirement pay in their complaint. Compl. 8-9, at ¶¶ 2-3. Air Force officers retired under chapter 867 of Title 10 of the United States Code, like plaintiffs, are entitled to retirement pay pursuant to 10 U.S.C. § 8929 (1994). Retirement pay statutes are money-mandating. See Lewis v. United States, 458 F.3d 1372, 1376 n.2 (Fed. Cir. 2006) (citing the statutes relating to the retirement pay of officers of the United States Navy and United States Marine Corps, as well as the statute entitling service members to retirement pay upon being retired for disability). Plaintiffs in this case were eligible for retirement pursuant to 10 U.S.C. § 8911 (as amended by subsection (b)(3)(A) of the TERA). Once the Secretary of the Air Force approved plaintiffs' retirement applications, plaintiffs became entitled to retirement pay pursuant to 10 U.S.C. § 8929. Accordingly, plaintiffs could have invoked this court's

---

broadly. Regardless, the issue of voluntariness is moot because it was not raised before the AFBCMR.

[8] As with plaintiffs' failure to amend their complaint with respect to their new allegations concerning the voluntariness of their retirement from the Air Force, see supra note 7, the court is disinclined to read plaintiffs' complaint too broadly with respect to its jurisdictional allegations.

jurisdiction pursuant to the Air Force retirement pay statutes.[9] However, as will be explained below, merely invoking the proper basis for jurisdiction is not sufficient to prevail.

**B. Plaintiffs Would Not Have Been Able to State a Claim Under 10 U.S.C. § 8929 for Which Relief Could Have Been Granted**

Assuming plaintiffs had framed their complaint so as to invoke this court's jurisdiction by relying on the statute mandating retirement pay for Air Force personnel–10 U.S.C. § 8929, the court's next inquiry is whether plaintiffs stated a claim upon which relief could have been granted. To make that determination, the court must examine the requirements of 10 U.S.C. § 8929.

According to 10 U.S.C. § 8929, Air Force retirement pay is computed pursuant to chapter 871 of Title 10 of the United States Code. As applied to the case at bar, chapter 871 provides that monthly retirement pay is the product of "the member's retired pay base" computed under 10 U.S.C. § 1407 and "the retired pay multiplier prescribed in 10 U.S.C. § 1409" for "the number of years credited to the member under" 10 U.S.C. § 1405. 10 U.S.C. § 8991(a)(1). The TERA then reduces retirement pay "by 1/12th of 1 percent for each full month by which the number of months of active service of the member are less than 240 as of the date of the member's retirement." TERA § 4403(e).

So long as defendant has computed plaintiffs' retirement pay accurately according to the above-cited statutes, plaintiffs cannot maintain a cause of action in this court. Plaintiffs have not alleged that their current retirement pay was calculated inaccurately; only that their estimated retirement pay was incorrect. Unfortunately for plaintiffs, there are no statutes or regulations mandating the payment of money for inaccurate estimates provided to service personnel contemplating retirement. C.f. Dehne v. United States, 970 F.2d 890, 892-94 (Fed. Cir. 1992) (noting that no statutes or regulations implicitly or explicitly mandated pay to a member of the Air National Guard for "service never actually performed"). Accordingly, plaintiffs could not state a claim under the Air Force retirement pay statutes upon which relief could be granted.

**C. Regulations Pertaining to Air Force Retirement Pay Cannot Provide This Court With Jurisdiction**

Additionally, in their opposition and cross-motion, plaintiffs cited the following United States Department of Defense ("Department of Defense") and Air Force regulations as the basis

---

[9] On the other hand, plaintiffs would not be able to establish jurisdiction under the TERA, independent of other retirement statutes, because the TERA, as a discretionary statute, is not money-mandating. See Greek v. United States, 44 Fed. Cl. 43, 46 (1999).

for this court's jurisdiction:[10] Department of Defense Financial Management Regulation 7000.14-R, Volume 12, Chapter 18 (Sept. 1996) ("DFMR12-18"); Department of Defense Financial Management Regulation 7000.14-R, Volume 7B, Chapter 10 (Feb. 2006) ("DFMR7B-10"); Air Force Instruction 36-2604, Personnel: Service Dates and Dates of Ranks (Dec. 2, 2004) ("AFI 36-2604"); and Air Force Instruction 36-3203, Personnel: Service Retirements (Aug. 10, 1994) ("AFI 36-3203").[11] As noted above, the court only can exercise jurisdiction pursuant to these regulations if the regulations are money-mandating. Loveladies Harbor, Inc., 27 F.3d at 1554. In other words, the regulations must grant plaintiffs, "expressly or by implication, a right to be paid a certain sum." Eastport S.S. Corp., 372 F.2d at 1007. The court examines each of the regulations cited by plaintiffs in turn.

First, DFMR12-18 "provides procedures for funding, accounting for, disbursing, and reporting retirement payments of those members chosen for early retirement under the provisions

---

[10] The Department of Defense promulgates several species of issuances. A Department of Defense Directive "is a broad policy document containing what is required by legislation, the President, or the Secretary of Defense to initiate, govern, or regulate actions or conduct by the [Department of Defense] Components within their specific areas of responsibilities." Directives Div., Dep't of Defense, What Are the DoD Issuances?, http://www.dtic.mil/whs/directives/general.html (last visited May 14, 2007). A Department of Defense Instruction "implements the policy, or prescribes the manner or a specific plan or action for carrying out the policy, operating a program or activity, and assigning responsibilities." Id. A Department of Defense Regulation "is a document of general application designed to implement, interpret, or prescribe procedural requirements." Id. Similarly, Air Force Policy Directives "are orders of the Secretary of the Air Force and contain directive policy statements to initiate, govern, and/or regulate actions within specified areas of responsibility by Air Force activities," and Air Force Instructions "are orders of the Secretary of the Air Force . . . [that] direct action, ensure compliance, and/or give detailed procedures to standard actions Air Force-wide." Air Force Instruction 33-360, Communications and Information: Publications and Forms Management (May 18, 2006). Air Force Policy Directives and Instructions "are necessary to meet the requirements of law, safety, security, or other areas where common direction and standardization benefit the Air Force." Id.

[11] Plaintiffs included portions of these regulations and instructions in the appendix attached to their opposition and cross-motion ("Pls.' App."). Specifically, plaintiffs appended the first three pages of DFMR12-18, Pls.' App. 1-3; the court located the fourth, omitted, page online. Plaintiffs also appended what appears to be the entirety of DFMR7B-10, id. at 6-8, and AFI 36-2604, id. at 9-41. Finally, plaintiffs appended only Attachment 8 of the September 12, 2003 version of AFI 36-3203, id. at 42-43, but offered to "supply the Court with a hard copy . . . if the Court so desires." Opp'n 15 n.2. The court was not required to make such a request of plaintiffs because defendant included the facially-relevant sections of the August 10, 1994 version of AFI 36-3203 in the appendix attached to its second reply ("Def.'s App."). Def. App. 1-54. For simplicity, the court will cite directly to the source documents instead of the parties' appendices.

of" the TERA. DFMR12-18, § 180101. The regulation requires the Defense Finance and Accounting Service to, among other tasks, "[e]stablish appropriate controls within the accounting systems to perform normal accounting and reporting functions for the TERA Program," id. § 180304(B); "[m]odify military pay systems to compute pay, benefits and withholding for the TERA Program participants," id. § 180304(E); and "[e]stablish procedures to assist early retirees with actions affecting their pay accounts," id. § 180304(G). While this regulation provides guidance concerning the administration of the TERA, it does not mandate payment of any money to military retirees for any failure by the military to comply with its provisions.

Next, DFMR7B-10 permits the "Secretary of a Military Department, . . . acting through boards of civilians of the executive part of that Military Department, [to] correct any military record of that department when the Secretary concerned considers it necessary to correct an error or remove an injustice." DFMR7B-10, §100101. Again, this regulation does not independently mandate compensation to those seeking a correction of their military records. It only provides instructions concerning the correction of the records. In fact, this regulation appears merely to implement 10 U.S.C. § 1552, which itself is not money-mandating. Martinez, 333 F.3d at 1315.

Finally, plaintiffs cite two Air Force Instructions. AFI 36-2604 "explains how to compute service dates and dates of rank and establishes who must compute, record, report, and correct them." AFI 36-2604, intro. And, AFI 36-3203 "sets procedures for carrying out laws, policies and [Department of Defense] directives that govern retirements for service (but not for physical disability)." AFI 36-3203, intro. Like DFMR12-18, these instructions provide administrative guidance. Neither instruction provides military retirees with an entitlement to compensation for any failure by the Air Force to comply with their terms.

In sum, none of the regulations cited by plaintiffs requires defendant to compensate plaintiffs, explicitly or impliedly. Because these regulations are not money-mandating, they cannot infuse this court with jurisdiction. Consequently, the regulations cannot support a cause of action in this court.

## IV. CONCLUSION

The court concludes that plaintiffs have failed to state a claim upon which relief can be granted for those claims over which this court possesses jurisdiction, and that even if plaintiffs had alleged jurisdiction under the appropriate statute, plaintiffs could not have stated a claim upon which relief could be granted. As a result, the court need not decide the cross-motions for judgment on the administrative record.

Certainly, this court has the power to review final decisions concerning the correction of military records. However, for the court to review such decisions, there must exist an underlying money-mandating statute or regulation under which a plaintiff can state a claim. While the Air Force retirement pay statute is money-mandating, plaintiffs have not put forth any evidence that

the Air Force incorrectly applied the statute. The court is appreciative of plaintiffs' service to the Nation and sympathetic to their situation, but it is constrained by the applicable law.

Accordingly, defendant's motion to dismiss is **GRANTED**. The Clerk is directed to dismiss plaintiffs' complaint. The cross-motions for judgment on the administrative record are **DENIED AS MOOT**. No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge